Name  DEXTER JOHNSON
Prison Number   TDCJ #999527
Place of Confinement   POLUNSKY UNIT, LIVINGSTON, TEXAS 77351
United States District Court   SOUTHERN DISTRICT OF TEXAS, HOUSTON
DIVISION

Case No.  _____

DEXTER JOHNSON
(PETITIONER)
v.

RICK THALER
(RESPONDENT)

and

THE ATTORNEY GENERAL OF THE STATE OF TEXAS
(ADDITIONAL RESPONDENT).

PETITION FOR WRIT OF HABEAS CORPUS BY A
PERSON IN STATE CUSTODY

PETITION

1. Name and location of court which entered the judgment of conviction under attack
   208TH DISTRICT COURT OF HARRIS COUNTY, TEXAS
2. Date of judgment of conviction: 6/13/2007
3. Sentence: DEATH
4. Nature of offense involved (all counts) CAPITAL MURDER
5. What was your plea?      (Check one)
   (a)   Not guilty   x
   (b)   Guilty   ☐
   (c)   Nolo contendere   ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to
   another count or indictment, give details:  _____

   _____

   _____

6.      Kind of trial:   (Check one)
        (a)   Jury   X
        (b)   Judge Only   ☐
7.      Did you testify at the trial?
        Yes  ☐   No   x

8.     Did you appeal from the judgment of conviction?
Yes  X   No   ☐

9.     If you did appeal, answer the following
(a)  Name of court <u>TEXAS COURT OF CRIMINAL APPEALS</u>
(b)  Result: affirmed
(c)  Date of result: 1/27/2010

10.    Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes  x   No   ☐

11.    If your answer to 10 was "yes" give the following information:
(a)(1)  Name of court: COURT OF CRIMINAL APPEALS
(2)  Nature of proceeding: 11071 HABEAS
(3)  Grounds raised _____

(4)  Did you receive an evidentiary hearing on your petition, application or motions?
Yes  ☐   No   x
(5)  Result: denied relief
(6)  Date of result: 6/30/2010

(b)  As to any second petition, application or motion give the same information:
(1)  Name of court
(2)  Nature of proceeding Grounds raised

(3)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☐   No   ☐
(4)  Result :
(5)  Date of result:

(d)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

|  |  | Yes | No |
|---|---|---|---|
| (1) | First petition, etc. | x | ☐ |
| (2) | Second petition, etc. | ☐ | ☐ |
| (3) | Third petition, etc. | ☐ | ☐ |

(e)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____
_____
_____

A. THE PETITIONER'S RIGHT TO COUNSEL DURING HIS INTERROGATION WAS VIOLATED UNDER EDWARDS V. ARIZONA 451 US 477 (1981).

B. THE PETITIONER IS A BRAIN DAMAGED SCHIZOPHRENIC WITH A LENGTHY HISTORY OF MENTAL DISABILITY AND PSYCHOTIC BREAKS. UNDER THE LINE OF REASONING FROM THE SUPREME COURT IN *ATKINS V. VIRGINIA* 536 U.S. 304 (2002) AND *ROPER V. SIMMONS* 543 U.S. 551 (2005). THE EXECUTION OF A SEVERELY MENTALLY DISABLED INDIVIDUAL SUCH AS MR. JOHNSON SERVES NEITHER RETRIBUTION NOR DEFERENCE AND THUS HIS DEATH SENTENCE SHOULD BE OVERTURNED.

C. THE TEXAS CAPITAL SENTENCING STATUTE UNDER ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE VIOLATES THE 8TH AND 14TH AMENDMENTS OF THE US CONSTITUTION BECAUSE THERE IS AN INHERENT CONFUSION REGARDING THOSE FACTORS THAT ARE MITIGATING VERSUS THOSE THAT MIGHT BE INTERPRETED AS FUTURE DANGER FACTORS THUS VIOLATING *PENRY/SMITH.*

D. THE QUESTION ON FUTURE DANGER VIOLATES THE 14TH AND THE 8TH AMENDMENT IN THAT IT PROVIDES NO GUIDANCE AS TO ITS INTERRELATION WITH THE OTHER SPECIAL ISSUES.

E. THE QUESTION ON MITIGATION VIOLATES THE 14TH AND 8TH AMENDMENT UNDER *PENRY/SMITH* BECAUSE IT FAILS TO PROVIDE GUIDANCE FOR THE JURORS IN RELATION TO THE OTHER SPECIAL ISSUES, THUS PREVENTING JURORS FROM GIVING EFFECT AND MEANINGFUL CONSIDERATION TO MITIGATING FACTORS.

F. THE PETITIONER'S RIGHTS WERE VIOLATED UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS HE WAS NOT COMPETENT TO WAIVE HIS RIGHTS TO SILENCE AND COUNSEL UNDER *MIRANDA V. ARIZONA* AND *EDWARDS V. ARIZONA.*

G. THE PETITIONER'S PROSECUTION AND CONVICTION FOR CAPITAL MURDER AND THE DEATH SENTENCE IMPOSED VIOLATED THE EIGHTH AMENDMENT AND THE EQUAL PROTECTION PROVISIONS OF THE FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS THE DEATH PENALTY IS ENFORCED IN A RACIALLY DISCRIMINATORY MANNER IN HARRIS COUNTY AND IN TEXAS.

H. THE PETITIONER WAS DENIED THE EQUAL PROTECTION OF THE LAW
GUARANTEED BY THE FOURTEENTH AMENDMENT AND EIGHTH
AMENDMENT UNDER *BUSH V. GORE* BECAUSE OF DISPARATE
TREATMENT DUE TO HIS RACE

I. THE PETITIONER IS DENIED EQUAL AND FAIR TREATMENT IN THE
TEXAS CLEMENCY PROCESS IN VIOLATION OF THE FOURTEENTH
AND EIGHTH AMENDMENTS UNDER *BUSH V. GORE* DUE TO HIS
RACE.

J. THE PETITIONER FAILED TO RECEIVE THE EFFECTIVE ASSISTANCE
OF COUNSEL ON APPEAL TO WHICH HE WAS ENTITLED WHEN THE
APPELLATE COUNSEL FAILED TO DEVELOP MERITORIOUS CLAIMS
ON DIRECT REVIEW.

K. SINCE THE CONVICTION OF THE DEFENDANT THE COURT OF
CRIMINAL APPEALS DECIDED *RUFFIN V. STATE*, WHICH AFFORDED A
DEFENDANT AN OPPORTUNITY TO REBUT THE PRESUMPTION THAT
HE POSSESSED THE CULPABLE MENTAL STATE OR INTENDED THE
RESULTS OF HIS ACTIONS.  THIS DEFENSE WAS UNAVAILABLE TO
HIM AT TRIAL, BUT SINCE HIS CONVICTION IS NOT YET FINAL HE
SHOULD BE GRANTED RELIEF AND PERMITTED THE CHANCE TO
OFFER THIS EVIDENCE TO REBUT THE ISSUE OF INTENT IN HIS CASE
IN CHIEF.

13.   If any of the grounds listed in 12A, B, C, were not previously presented in any other
court, state or federal, state *briefly* what grounds were not so presented, and give
your reasons for not presenting them:

_____

_____

_____

14.   Do you have any petition or appeal now pending in any court, either state or federal,
as to the judgment under attack?
Yes □   No   x

15.   Give the name and address, if known, of each attorney who represented you in the
following stages of the judgment attacked herein:
    (a)  At preliminary hearing: James Leitner and Anthony Osso
    (b)  At arraignment and plea: James Leitner and Anthony Osso
    (c)  At trial: James Leitner and Anthony Osso
    (d)  At sentencing: James Leitner and Anthony Osso
    (e)  On appeal: Charles Hinton
    (f)  In any post-conviction proceeding counsel: Patrick McCann
    (g)  On appeal from any adverse ruling in a post conviction: Patrick McCann

      (e) On appeal: Charles Hinton

      (f) In any post-conviction proceeding counsel: Patrick McCann

      (g) On appeal from any adverse ruling in a post conviction: Patrick McCann

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐ No x

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No x

      (a) If so, give name and location of court which imposed sentence to be served in the future: _____

      (b) And give date and length of sentence to be served in the future: _____

      (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney
Patrick F. McCann

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


Cause No. 4:10-mc-00318


DEXTER JOHNSON,
PETITIONER

V.

RICK THALER, Director
Texas Department of Criminal Justice,
Correctional Institutions Division,
RESPONDENT


BRIEF IN SUPPORT OF HABEAS WRIT

I.   Allegation of Illegal Restraint

Petitioner is held in violation of law and the United States Constitution by the

Texas Department of Criminal Justice, Institutional Division, pursuant to a conviction

for Capital Murder and sentence of death in Cause 1085483 in the 208th District Court,

Honorable Denise Collins presiding.  His direct appeal was affirmed January 27, 2010.

His first and state writs was denied on June 30, 2010.

## INDEX OF EXHIBITS

Exhibit 1-Judgment and Sentence

Exhibit 2- Jury Charge

Exhibit 3- PET and MRI Scan

Exhibit 4- Harris County Sheriff's Office Medical Records

Exhibit 5- North Forest School District Records

Exhibit 6- CPS Records

Exhibit 7- Death Penalty Information Report

Exhibit 8- Media reports

## STATEMENT OF THE CLAIMS

**CLAIM A**
**THE PETITIONER'S RIGHT TO COUNSEL DURING HIS INTERROGATION WAS VIOLATED UNDER EDWARDS V. ARIZONA 451 US 477 (1981).**

Once an accused has expressed his desire to have counsel present at an interrogation, the authorities must stop the interrogation until counsel is made available to him. See *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981). Whether an accused makes a clear implication to the right to counsel depends on the totality of the surrounding circumstances. See also *Davis v. United States* 512 U.S. 425, 459 (1994). If an accused's implication to the right to counsel is clear, his responses <u>after</u> the request for counsel to further interrogation may not be used to undermine or cast doubt out on the clarity of his first request. See *Smith v. Illinois,* 469 U.S. 91, 100 (1994). Subsequent events may matter to determine whether an accused renounced his right to counsel after invoking it. See *Smith v. Illinois*, 469 U.S. at 98. The accused must show a desire to talk about the investigation that of his own volition. See *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 1983. The findings by the trial court, supplied to the Court of Criminal Appeals as per the Texas Rules of Criminal Procedure regarding findings of fact indicated that Mr. Johnson clearly invoked his right to counsel. [See trial court findings and page 10, slip opinion, *Dexter Darnell Johnson v. State of Texas*, No AP-75479] At page 10 of the opinion, the Court of Criminal Appeals confirmed that Mr. Johnson invoked his right to counsel at the end of the interview. The detective who was conducting the interview then, after attempting to reengage, terminated the interview. [See pg 132, slip opinion discussing Detective Caruthers' actions during the interrogation] Where the Court of

Criminal Appeals' determinations wander off track begins at page 12 of the slip opinion where, after analyzing the discussion that takes place between Caruthers and Mr. Johnson, the Court of Criminal Appeals somehow determined that Mr. Johnson's post invocation of counsel comments somehow constituted the initiation of further communication. See slip opinion, *Dexter Darnell Johnson v. State of Texas*, page 12. This is a complete misinterpretation of *Edwards v. Arizona*, 451 U.S. at 484-85. Somehow pursuant to this twisted and almost gymnastic line of reasoning, the Court of Criminal Appeals found that the brief and somewhat hostile exchange between detective, Caruthers, Hargrave and Mr. Johnson had essentially waived his implication of counsel, thus permitting a third detective name Abbondondalo to question him at HPD homicide. There was an audio recording of this admitted as a state's exhibit where Abbondondalo clearly initiates conversation and asks if he felt comfortable talking. This was in direct contravention of Mr. Johnson's right to counsel. Thus this finding is by the Court of Criminal appeals is clearly unreasonable in light of firmly established federal law under *Edwards v. Arizona*, id. The Court somehow found that these interviews, separated in time by two days with different police officers were somehow viewed together to permit the Court of Criminal appeals to find that Mr. Johnson had waived his prior invocation to right of counsel. That was <u>never</u> something Mr. Johnson actually said and the Court of Criminal Appeals actions here were simply an attempt to insert a waiver where none existed.

It is well established that once an accused invokes his Fifth Amendment right to have counsel present for the interrogation regarding one offense, the accused may not be re-approached regarding any offense until counsel is present. *Miranda v. Arizona*, 384 U.S.

426, 86 S.Ct. 1602, 16 L.Ed. 1594 (1966). The record is clear from that onset, Mr. Johnson requested counsel at his first interview in Humble. (See suppression hearing.) The Supreme Court has stated that once an individual invokes his right to counsel, law enforcement must immediately ceases all questioning of that individual. *Edwards v. Arizona*, 451 U.S. 477 (1981). Moreover, the Court has held that *Edwards* protection does not cease once the suspect consults with an attorney and the mere availability of counsel does not overcome the requirement to cease communication with the suspect until and unless counsel is present. *Minnick v. Mississippi*, 498 U.S. 146 (1990). ***Finally, an accused's post-request responses to further interrogation may not be used to cast doubt upon the clarity of his initial request for counsel***. *Smith v. Illinois*, 469 U.S. 91 (1984). The purpose being *Edwards* and *Minnick* is to prevent police from using intimidation tactics to obtain confessions. That purpose is served only by requiring that all further communications with a suspect must cease once a suspect/defendant asserts his right.

Mr. Johnson's request in this case was sufficiently clear. Petitioner's request followed the reading of his *Miranda* rights and took place while he appointed counsel. Hiding behind the distinction of which crime the interrogation applied to and then declaring his assertion of his right ambiguous completely undermines the purpose behind the holding in *Miranda* and its progeny. As recognized in *Davis*, at 7, the "clear assertion of the right to counsel might disadvantage some suspects who -- because fear, intimidation, lack of linguistic skills, ... will not clearly articulate their right to counsel although they actually want to have a lawyer present ... will not clearly articulate their right to counsel although they actually want to have a lawyer present." Mr. Johnson's

low IQ, organic damage, and history of poor comprehension regarding written or

complex materials are more reasons that this Court must find that he clearly invoked his

right to counsel.

The Fifth Amendment right to counsel does not depend on whether the suspect has

been arrested or not. *Arizona v. Roberson*, 486 U.S. 675 (1988). Thus, the initial

interview with Mr. Johnson is still covered for purposes of Fifth Amendment protection.

Moreover, Mr. Johnson's Sixth Amendment right to counsel is violated despite the fact

that he was not specifically charged with the case he was being questioned about.

Because of the nature of the death penalty sentencing, undoubtedly evidence of the

murders would have been used to argue future dangerousness at the punishment portion

of the Ngo-Arapece murder. Thus, any admissions that would prejudice the defendant in

a case where he already indisputably has an attorney are subject to *Miranda*, and

*Edwards* and must be excluded.  The Petitioner should be granted relief on these grounds.

## CLAIM B

**THE PETITIONER IS A BRAIN DAMAGED SCHIZOPHRENIC WITH A LENGTHY HISTORY OF MENTAL DISABILITY AND PSYCHOTIC BREAKS. UNDER THE LINE OF REASONING FROM THE SUPREME COURT IN *ATKINS V. VIRGINIA* 536 U.S. 304 (2002) AND *ROPER V. SIMMONS* 543 U.S. 551 (2005). THE EXECUTION OF A SEVERELY MENTALLY DISABLED INDIVIDUAL SUCH AS MR. JOHNSON SERVES NEITHER RETRIBUTION NOR DEFERENCE AND THUS HIS DEATH SENTENCE SHOULD BE OVERTURNED.**

Mr. Johnson has been examined by a qualified mental health professional and has

found to be schizophrenic. [See testimony by Dr. Watson, Vol. 31, see testimony of Dr.

Dudley, M.D. and Timothy Branaman, vol. 32, Dr. Longmire, Vol. 33.] This diagnosis is

supported by extensive evidence of family history of mental illness and by the

observations of other family members themselves and the jail records. [See jail records attached, see also testimony of mother and sister at punishment, Vol. 30-31.]

In *Atkins v. Virginia* the Supreme Court of the United States held that those who suffer from mental retardation should not be executed. Reasoning that individuals who were fundamentally different in capability should also be held to a different standard of moral culpability, the court noted in both their independent judgment and in the judgment of many states that the retarded were held to be less responsible for their actions and hence **did not** come under the category of "worst of the worst" for which we reserved the penalty of death. *Atkins v. Virginia* at 536 U.S. 304 (2002). Later in *Roper v. Simmons* 543 U.S. 551 (2005) the Court held under similar reasoning that because juveniles as a group were less capable of restraining their actions and understanding the consequences of those same actions that it would serve neither the purposes of retaliation nor that of deterrence to impose the ultimate penalty on those whose youth prevented them from behaving with the moral consciousness and foresight of adults. *Roper v. Simmons,* id. In both of these cases the Court exercised both its own judgments as independent arbiter of the constitution and the growing consensus both nationally and internationally against holding the less capable as culpable as the rest of us. See *Roper v. Simmons* and *Atkins v. Virginia.* While severe mental illness also renders any individuals less capable even when it falls short of outright insanity, it is now time for Texas to recognize that in this case, under these facts, that imposing a death sentence would be unconstitutional under the reasoning of *Atkins* and *Roper*.

The Petitioner does not seek a blanket prohibition of the execution of those suffering from mental illness or disability. However, in severe cases, such as those who suffer

from schizophrenia or traumatic brain injury or other crippling diseases such that they could not maintain a normal life without extensive psychiatric assistance and medication, then in those particular cases execution serves neither the purposes of retaliation nor deterrence. See *Ford v. Wainwright* 477 U.S. 399 (1986); see also *Panetti v. Quarterman* 551 U.S. 930 (2007).

In the instant case, as is common with most male schizophrenics of his age, Mr. Johnson began to suffer delusions and hallucinations while in jail. [See Harris County records attached.] His family noted disabilities at an early age. His speech was slow to develop and he was in special education classes throughout his very limited academic career. (See North Forest ISD records attached.) His jail records indicate delusions, suicide attempts, self mutilation, anxiety and depression. (See jail records attached.) There is no indication that he <u>ever</u> received treatment for either his severe brain damage or his voices and delusions outside of jail. It is ironic that if he had been treated *before* this tragic crime, this Honorable Court might not be reviewing this case now.

As of this writing, only one state absolutely forbids the imposition of the death sentence on the severely ill. See Connecticut Annotated Statutes. All states prohibit the execution of the insane since the case of *Ford v. Wainwright* 477 U.S. 399 (1986). Multiple states list severe mental illness as a mitigating factor in determing whether to impose death. [This list includes almost two thirds of the states that impose the death penalty]

The Petitioner had an ongoing psychiatric illness that was tracked well before he met the deceased. Schizophrenia is not a condition that either "heals" or "gets better". It is a chemical imbalance in the brain that produces delusions and in some cases, paranoia.

[See Diagnostic and Statistical Manual IV.] It requires ongoing mediation and psychiatric evaluation in order to show any improvement or to approach a mental state that would resemble normalcy. See DSM IV. Mr. Johnson was <u>not</u> receiving treatment of the time of the shooting. These are facts which should indicate that Mr. Johnson is among that narrow group of the severely mentally ill or disabled for whom a death sentence is constitutionally inappropriate under the reasoning of *Atkins* and *Roper*. Thus this claim should result in a grant of relief by this Honorable Court and a recommendation that the death sentence be overturned, or in the alternative, should merit additional fact finding and a hearing.

**CLAIM C, D, AND E**
**THE TEXAS CAPITAL SENTENCING STATUTE UNDER ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE VIOLATES THE 8ᵀᴴ AND 14ᵀᴴ AMENDMENTS OF THE US CONSTITUTION BECAUSE THERE IS AN INHERENT CONFUSION REGARDING THOSE FACTORS THAT ARE MITIGATING VERSUS THOSE THAT MIGHT BE INTERPRETED AS FUTURE DANGER FACTORS THUS VIOLATING *PENRY/SMITH*.**

**THE QUESTION ON FUTURE DANGER VIOLATES THE 14ᵀᴴ AND THE 8ᵀᴴ AMENDMENT IN THAT IT PROVIDES NO GUIDANCE AS TO ITS INTERRELATION WITH THE OTHER SPECIAL ISSUES.**

**THE QUESTION ON MITIGATION VIOLATES THE 14ᵀᴴ AND 8ᵀᴴ AMENDMENT UNDER *PENRY/SMITH* BECAUSE IT FAILS TO PROVIDE GUIDANCE FOR THE JURORS IN RELATION TO THE OTHER SPECIAL ISSUES, THUS PREVENTING JURORS FROM GIVING EFFECT AND MEANINGFUL CONSIDERATION TO MITIGATING FACTORS.**

Whether one considers the questions separately, or as they relate to each other, or in the aggregate, the Texas capital scheme cannot stand because of the inherent conflict between the questions as they are applied to Mr. Johnson. In the aggregate the questions work against each other; the jury flounders about trying to determine whether one piece of evidence, such as mental illness, should be considered as mitigating or future danger

evidence. It must also decide whether probability means *any* chance, or more likely than not, and what standard of proof to use in establishing what constitutes a "danger" to a future society.

Under *Penry* I and II, *Smith* I and II, *Tennard v. Dretke* and a host of other decisions it is clear that Texas has genuinely gotten the sentencing schemes <u>wrong over the past many years</u>. This sentencing scheme cannot and must not stand.  Whether the Court chooses to address the tensions or problems in each question in an attempt to save the over-all scheme or whether it invalidates the entire process, it must recognize that this is a deeply flawed procedure that violates the 8th and 14th Amendments on a fundamental level.

The Supreme Court's recent series of decisions in *Brewer v. Quarterman*, et al, 550, U.S. _____ (2007), 127 S. Ct. 1706, 1710-11 (2007) and in its companion cases [*Smith II and Abdul Kir*] regarding the older, original versions of the "Special Issues" , including the attempts to correct them via the introduction of a "nullification" question, are instructive here, and since they were so recent, another gateway into a review of the current death questions at issue in Mr. Johnson's case.  The reasoning in those cases makes it clear that <u>*any*</u> questions which do not permit a full and fair presentation of any mitigation evidence in a death case are constitutionally infirm.  Although the new questions were not specifically under the microscope in those cases, under that reasoning now available to the Petitioner, the current questions can be so scrutinized, and should be.

The confusion and inescapable tension between the questions, as well as the complete absence of any meaningful guidance or review on the separate questions, makes them impossible to work with for any rational fact-finder, and in fact result in "default"

verdicts of death, completely depriving the Petitioner (and others) of their rights under the Eighth and Fourteenth Amendments.

In this case, the jury was given no real guidance whatsoever of how to interpret clear evidence of organic brain damage in line with the inherent damage of all three charges provided in punishment; the future dangerousness, the party charge, and the mitigation question. As an example of how the interplay between the questions worked to the detriment of the Petitioner, the jury was given no instruction on whether to consider the brain damage as it applied to future dangerousness. The inability to understand written materials or to recall or plan things could be interpreted in a variety of ways, none of which were explained to the jury. Although they did learn through testimony of the classification system in the Texas Department of Criminal Justice for inmates, they were not instructed to consider his disabilities, for instance, would normally have resulted in special placement for him in a more restrictive, structured, and healing environment.

Likewise, the presence of medication (as shown by the Harris County Jail records) and its effect on Mr. Johnson's behavior in TDCJ was never truly explored. Both of those factors should have specifically presented to the jury to consider as a lack of future dangerousness, yet they were not.

The mitigation question lacked any direction by the trial court as to whether this person's inability to function without assistance should be specifically considered as mitigation. In fact, some of his disabilities may have been turned around and worked against him in jury deliberations because one could, as an example, plausibly argue that the schizophrenia or his limited ability to comprehend due to the traumatic brain injury

might actually increase his potential for explosive violence.  This obviously has some intersecting areas with the question on future danger since if <u>that</u> question had been given to the jury with proper guidelines, they would have already rejected Mr. Johnson's disability as a potential factor in future dangerousness and thus would be free to consider his very severe disability as a mitigation factor exclusively.  The inherent tension between these questions comes into further review quite clearly when one looks at the party's questions which specifically asks "whether Mr. Johnson reasonably anticipated that a human life would be taken".  If the jury in fact looked at the party's charge on punishment *without* considering his limited ability to form a reasonable anticipation or intent due to his mental dysfunction, then this case illustrates an extraordinarily high risk of an undue death sentence specifically because of the lack of meaningful guidance and risk of confusion for the capital jury.  In the aggregate or by themselves, these claims should result in relief on Mr. Johnson's death sentence.

## CLAIM F
**THE PETITIONER'S RIGHTS WERE VIOLATED UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS HE WAS NOT COMPETENT TO WAIVE HIS RIGHTS TO SILENCE AND COUNSEL UNDER *MIRANDA V. ARIZONA* AND *EDWARDS V. ARIZONA*.**

In testimony, during psychiatric examinations and during brain scans, several forensic mental health professionals indicated that Mr. Johnson did indeed appear to suffer from impairment and mental problems.  It seems clear that there is a factual issue as to whether or not Mr. Johnson had sufficient presence of mind to voluntarily waive his rights under the Fifth and Sixth Amendments when he was questioned.  In simple terms, can a mentally impaired or intoxicated person truly ever waive their rights under police custodial questioning?

If one looks at the reports from River Oaks Imagining, the school records, and the testimony of family members and Dr. Gur, as well as the testimonies of other mental health professionals brought by the trial team, one should be able to see that for an individual with a low IQ, organic impairment that shows up as a picture of what is quite literally a "dead zone" in his higher cognitive functions and verbal and written abilities, then it seems an appropriate question as to whether he <u>actually</u> understood and voluntarily waived his rights during questioning.  In reviewing the voluntariness of a statement, one must look to the "totality of the circumstances" *Katz v. United States* 389 U.S. 347 (1967).

The greatest difficulty here is that the voluntariness question is designed primarily to deter overreaching conduct by the officers rather than protecting criminals from their own mistakes of judgment.  Yet the Supreme Court has held that juveniles may merit special protection when giving statements; why then do not the mentally challenged or handicapped? The reasoning here is subtlety distinct- the purpose is to protect the vulnerable from police conduct, that, while not overreaching when applied to a person of normal capacity, is certainly a different matter when applied against the severely challenged, retarded, or incompetent.  Thus under the totality of the circumstances doctrine here, Mr. Johnson's statements should not have been admissible absent in inquiry into his mental capacity to intelligently waive his rights.  Since no inquiry was made by the trial court this is a structural problem under the Sixth, Eighth, and Fourteenth Amendments and should merit relief.

**CLAIM G**
**THE PETITIONER'S PROSECUTION AND CONVICTION FOR CAPITAL**
**MURDER AND THE DEATH SENTENCE IMPOSED VIOLATED THE EIGHTH**
**AMENDMENT AND THE EQUAL PROTECTION PROVISIONS OF THE**
**FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS**
**THE DEATH PENALTY IS ENFORCED IN A RACIALLY DISCRIMINATORY**
**MANNER IN HARRIS COUNTY AND IN TEXAS.**

The Fourteenth Amendment states, "...no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The Eighth Amendment prohibits the imposition of punishment which is "...cruel and unusual..." Selective prosecution, if based upon improper motive, can violate the equal protection clause of the Fourteenth Amendment. *U.S. v. Kahl*, 583 F.2d 1351 (5th cir. 1978). In an equal protection claim, it is necessary to show that other similarly situated defendants were not prosecuted. Then one must show that said prosecution was motivated by bad faith or membership in a protected class. *U.S. v. Green*, 697 F2d. 1229 (5th Cir. 1989), *cert den*, 463 U.S. 1210.

Those protections are applicable to the states, and once a state creates a process for litigating or deciding questions involving substantive rights, "..it must act in accord with the dictates of the Constitution". *Evitts v. Lucy*, 469 U.S. 387, 396 (1985), (discussing the due process requirements of state created forums). The death penalty requires a heightened degree of certainty because of the ultimate nature of the issues involved, and additional procedural protections are thus appropriate. *Beck v. Alabama*, 447 U.S. 625 (1980). A person raising an equal protection claim has the burden of showing "the existence of purposeful discrimination". *Whitus v. Georgia*, 385 U.S. 545 (1967). "It

would seem to be incontestable that the death penalty if inflicted on one defendant is "unusual" if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices." Concurring opinion, J. Douglas, *Furmna v. Georgia,* 408 U.S. 238 (1972).

The Petitioner is an African-American male. As such, he is a member of a protected class. *Batson v. Kentucky,* 476 U.S. 79, 90 (1986). As demonstrated by the facts put forth in this argument, his chances of receiving the death penalty in the United States, and in particular in Harris County, Texas, are far greater simply *because* he is an African-American. In fact, the statistical correlation is comparable to that between smoking and heart disease. The Petitioner should be granted relief on these grounds, or in the alternative this Honorable Court should require a hearing so that the officials in charge of administering and setting the aforementioned policy may defend it in open court.

There is a long history of racial discrimination in the application of the death penalty in the United States. The Death Penalty Information Center in Washington, D.C. released a disturbing report in 1998, which it continues to update, a report entitled "The Death Penalty in Black & White: Who Lives, Who Dies, Who Decides". The report was in essence the finding of two separately compiled studies, one focusing on the death penalty as applied in Philadelphia, Pennsylvania, and the other study focusing on nation patters of racial discrimination in enforcement of the death penalty. In the Executive Summary of this report the first paragraph states clearly the unambiguous conclusions of the two studies:

**"The results of two new studies which underscore the continuing injustice of racism**
**in the application of the death penalty are being released through this report.**
**The first study documents the infectious presence of racism in the death**
**penalty, and demonstrates that this problem has not slackened with time, nor**
**is it restricted to a single region of the country.  The other study identifies**
**one of the potential causes for this continuing crisis: those who are making**
**the critical death penalty decisions in this country are almost exclusively**
**white."** Executive Summary, pg. 1, "The Death Penalty in Black & White: Who
Lives, Who Dies, Who Decides", June 2000.

In the body of the report, the first study reveals that, after allowing and adjusting

raw data for severity of facts and background [i.e. criminal history, mental capacity, and

other circumstances] of the defendant, a black was nearly *four times* more likely to

receive a death sentence than a white in Philadelphia.

In the second study, a law professor at St. Mary's University in Texas

demonstrated a potential reason for some of this discrepancy: of all the elected District

Attorneys in all the counties which employ the death penalty in the United States, only

1% are African America.  98% are white males.  In Texas specifically, there is only one

single elected black District Attorney anywhere in this state, and only a handful of the

District Attorneys are Hispanic.  All of the remaining District Attorneys are white.

This is not a new pattern.  Since 1976, when the death penalty was again ruled

constitutional, over half the inmates placed on death row have been African-American,

Latino, Native American or Asian.  In cases where executions were carried out,

approximately 80% were cases in which the victim was white. *Death Row, USA,* NAACP

Legal Defense and Education Fund, Inc, at 1, 3 Spring 1998.  In 1993, the Justice

Department noted that despite the fact that African American's account for half of the

murder victims each year, those condemned to death were in 85% of the cases analyzed

condemned for killing a white person.  BUREAU OF JUSTICE STATISTICS, U.S.

DEPT. OF JUSTICE, SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS, 1993,

at 384, Table 3.128 (edited by Kathleen Maguire & Ann L. Pastore, 1993) [Admittedly,

the issue of cross-race victims is not specifically on point to this particular matter, but it

is certainly illustrative of how discriminatory the enforcement of penalty remains.]  A

1990 study by the General Accounting Office found a "remarkably consistent" pattern of

racial discrimination in capital sentencing across the county.  GENERAL

ACCOUNTING OFFICE, DEATH PENALTY SENTENCING: RESEARCH

INDICATES A PATTERN OF RACIAL DISPARITIES 5 (Feb. 1990).  This was again

validated in a more recent study by the Department of Justice and by the Congressional

Judiciary Committee.  See 2000 DOJ report "Racial Disparities in Federal Death

Penalty"; also see the 103rd Congress' Staff Report to the Judiciary Committee.  Likewise

see **Race and the Federal Death Penalty**", by *Kevin McNally*, 4 DePaul Law Review

53.

Nor this is a "national" problem or a problem just for "other" states.  In 1994 a

review of death penalty cases in Harris County found that this county had sentenced

blacks to death row nearly twice as often as whites during the preceding ten years, an

imbalance that actually eclipsed the pre-civil rights days during the use of "Old Sparky"!

See Bryan Denson, *Death Penalty: Equal Justice?* The Houston Post, Oct. 16, 1994 at

A1.  This trend of separate and "unequal" enforcement against blacks has continued well

into today.  (See **A State of Denial**", a study by the Texas Defender Service, released in

2006, Ch. 4, attached to this application.)

This tragic legacy has regrettably lived on in the person of the elected DA, Chuck Rosenthal, the man who decided against whom the state should seek death.  Mr. Rosenthal was forced to resign his post after allegations of racism in his office and specific racist emails on his county account came to light.  (See Houston Chronicle article attached.) Mr. Rosenthal was also the individual who approved seeking death penalty for Mr. Johnson.

Mr. Rosenthal admitted to a continuing abuse of prescription drugs and alcohol during the years he served as both first assistant and eventually as the elected District Attorney. (See Houston Chronicle articles attached.)  It is difficult to imagine that if racist and callous attitudes existed at the top of the District Attorney's Office that they somehow did not seep into the decisions about whom to execute and whom to offer a deal.  Yet it is not only circumstantial and anecdotal evidence that it makes it clear that Texas enforces the death penalty in a racially discriminatory manner.

Of the current death row population in Texas at least 143 are blacks, making them almost 41% of the total death row population, last estimated at some 358 individuals. Based on 2000 census figures, this is far out of proportion to their representation in the general population, which is approximately 19% percent here in Harris County and in Texas. Also, in Harris County, the Petitioner asks that the Honorable Courts reviewing this matter note that at the time of Mr. Johnson's conviction, of 22 felony criminal district court judges, only two were black.  (As of the 2008 elections this number has doubled.)

On the Court of Criminal Appeals, which review all death penalty cases and which will review this matter, there is no black judge at all.  Of the local Courts of Appeals, the 14th and 1st Courts, there is one black justice out of 18 current office holders.

The elected district attorney is a white female, and the overwhelming majority of her assistants are white. The jury which heard the evidence in this case was predominantly white. In a case where the deciders of death are almost never black, and in a system which has a lengthy legacy of rampant racism, there is more than enough here to develop additional facts and to conduct a hearing, and in the end, to grant relief.

**CLAIM H**
**THE PETITIONER WAS DENIED THE EQUAL PROTECTION OF THE LAW GUARANTEED BY THE FOURTEENTH AMENDMENT AND EIGHTH AMENDMENT UNDER *BUSH V. GORE* BECAUSE OF DISPARATE TREATMENT DUE TO HIS RACE**

The Petitioner is an African-American male, and a member of a protected class under *Batson v. Kentucky*, 476 U.S. 79 (1986). As pointed out in previous factual addendums to this Honorable Court, the incarceration rate and the rate of which blacks receive the death penalty in Texas and in Harris County are far out of proportion to their share of the general population. *Bush v. Gore*, 531 U.S. 98 (2000), was decided on December 12, 2000.

The Petitioner has demonstrated to this Honorable Court that he is an African-American male. In Texas overall the percentage of African-Americans is at approximately 12% according to figures from the U.S. Census Bureau. [See attached Census abstracts] In Harris County the figure as a general share of the population is almost 19%. Yet blacks make up almost half the death row population nationally and here in Texas based on per figures from the Death Penalty Information Center.

The Petitioner provided a breakdown from open press sources not long before the Petitioner's trial that showed a black male is twice as likely as a white male to receive the death penalty in a capital case in Harris County. [See series by the Houston Chronicle

attached.] Since then a number of studies by a variety of agencies have pointed out the inequities in the racial skewed imposition of the death penalty across the nation. [See Texas Defenders Service study, "A State of Denial"]

The evidence continues to mount that the imposition of the death penalty continues to burden blacks disproportionally, far out of whack with their share of the population.  It is inflicted upon blacks in Texas, and in Harris County specifically, at a rate that bears no correlation to the size of their part in our community, to the rate at which capital crimes are committed or by whom, nor to anything discernible to the casual observer other than the fact that **they are black**.  Where a system continues to treat on segment of its people in a vastly different way than another segment, there must be a means of correcting that wrong within the law.

The right to life is a fundamental one, and no citizen may be deprived of his or her life without due process of law. U.S. const. AMEND XIV. Racial discrimination in the criminal justice system is a violation of the Equal Protection clause of the Fourteenth Amendment.  See *Alexander v. Louisiana* 405 U.S. 625 (1972) (regarding grand jury selection); *Castaneda v. Partida*, 430 U.S. 482 (1977) (discrimination against Hispanics in grand jury selection violates equal protection); *Batson v. Kentucky*, 476 U.S. 79 (1986) (discrimination in selection of petit jurors violates equal protection); and *Furman v. Georgia*, 408 U.S. 238 (1972) (death penalty held invalid as it is arbitrarily applied).

*Batson* mentions the high court's "unceasing" efforts to eradicate racial prejudice from our trial system. *Batson v. Kentucky*, 476 U.S. at 85.  It is in fact the jury trial that is the only protection of life and liberty against race and color prejudice. *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880).  Despite many years of clear precedent regarding our

judicial system's struggles with racial discrimination, however, the Supreme Court appeared to retreat from its own mandate to seek out and eliminate racial discrimination in *McClesky v. Kemp*, 481 U.S. 279 (1987).  In that Georgia case the petitioner brought claims of racial discrimination in the application of the death penalty based upon the overwhelming statistical evidence showing that a black was far more likely than a white to receive the death sentence in that state. The Supreme Court, while noting the study and agreeing that it could show that race may have entered the deliberations of some cases, stopped short of invalidating the Georgia death penalty scheme on equal protection grounds. The Court could simply not bring itself to admit the bald truth; Georgia's death penalty scheme was broken and until there was a race neutral procedure for screening those chosen for the death penalty it would remain so.

It held, despite all the evidence gathered from more than 2,000 cases studied in the state of Georgia that tended to show the application of the facially race neutral statute was infected by discrimination, the study [called the "Baldus" study for its main author] could not show the *intent* of the legislature who drafted the law was discriminatory.

Yet in December of 2000, faced with a difficult presidential election thrown into doubt due to poor vote counting, and the nation's leadership in the balance, the Supreme Court returned to its plain reading of the guarantees under the Fourteenth Amendment in its decision in *Bush v. Gore*, 531 U.S. 98 (2000).

The technical problems with the vote counting in this case are not of concern to this Honorable Court; rather, it is the expansive and strong reading of the equal protection clause that is more critical and relevant to this case. To quote the Court, it found that voting was a fundamental right,  that the source of its fundamental nature lay in the equal

worth attributed to each citizen's rights, and to the manner of its exercise. *Bush v. Gore*, 538 U.S. at 104. Having once granted a right [in this case, to vote] on equal terms, the state may not later, by arbitrary and disparate treatment, value one person's right over another. *Bush v. Gore*, 531 U.S. at 104.

The Court traced its analysis to prior civil rights cases, which diluted individual rights, voting rights specifically. See *Gray v. Sanders*, 372 U.S. 368 (1963). It noted the request for speed by one of the litigants in the *Bush* case, but opined that the desire for speed is not an excuse for ignoring equal protection guarantees. *Bush v. Gore*, 531 at 107.

The Court also expressed concern that the judicially proposed remedies of the Florida Supreme Court raised even more problem. It noted that when a statewide remedy is prepared, it should still retain the rudimentary assurances that equal treatment and fair play will be observed. *Bush v. Gore*, 531 at 107.

The Court's language is strong and unequivocal. The requirements of *McClesky v. Kemp* to evidence purposeful intent of discrimination in an equal protection claim are gone. Now, under *Bush v. Gore*, an Petitioner must show disparate treatment of a fundamental right, in this case his right to life. It is through these new yet somehow familiar seas that this Honorable Court must now navigate. It can turn to a reliable compass in this navigation, the many valid studies that clearly establish that Texas and Harris County do treat black males differently from others in capital cases.

These studies provide only a starting point in this journey, however.

The next step is, as in a *Batson* or *Castaneda* inquiry, is to give the parties a forum to review and offer explanations for the seeming racial discrimination. This is not

onerous; thousands of trial courts have held *Batson* hearings when an allegation of discrimination comes up.  Other courts have held habeas and other hearings on grand jury discrimination under *Castaneda* and have not suffered nor collapsed under the weight of such requirements.  Such an open hearing actually gives the State protection and a means of answering an Petitioner's claims with race neutral explanations of their decision making, decision making that ought to be able to stand the light of day.

The Supreme Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000) provides a new means of examining claims of denial of equal protection, a means which is critically important in a capital context.  The right to life is every bit as fundamental as the right to vote, and if one simply substitutes the word "life" for "vote" in the Supreme Court's own opinion, it rings every bit as true and does not lose a bit of its power.  In a county such as Harris County with a sad history of racial discrimination of the application of the death penalty, this Court should grant discover regarding potential racial motivation behind the selection of Mr. Johnsons as the recipient of the death penalty and it should without hesitation, permit the exploration of all potential discriminatory issues in this case via hearing or other fact finding.

## CLAIM I
## THE PETITIONER IS DENIED EQUAL AND FAIR TREATMENT IN THE TEXAS CLEMENCY PROCESS IN VIOLATION OF THE FOURTEENTH AND EIGHTH AMENDMENTS UNDER *BUSH V. GORE* DUE TO HIS RACE.

The Petitioner appears caught between a rock and a hard place in Texas procedural rules. If he waits until any potential claim under the clemency procedure is "right" then he will be dismissed for abuse of the writ under Section 5 of Article 11.071.  Thus he must bring any potential claim against any procedure in the first writ, so he brings this

claim under Equal Protection against the facial procedures and standards of the Texas Board of Pardons and Paroles for commutation of the death sentence.

The Petitioner is an African-American male convicted of a capital crime in Texas. The Board of Pardons and Paroles, which oversees clemency applications, has, to the Petitioner's knowledge, never recommended clemency for an African-American convicted of a capital crime since its current rules came into existence.  This is based upon the last figures available to the Petitioner from a variety of sources, over one hundred applications from black males for commutation of their sentences. While the Petitioner acknowledges that the granting of relief and commutation has been almost as stingy against all Petitioners.  It is the Petitioner's position that if some form of commutation so to be notionally available, then it must be available to all, regardless of race or creed or color. If it is not then under *Bush v. Gore* it must be revised so the Petitioner can have a fair shot at mercy.

As a threshold matter, there is no other forum to raise these claims. Certainly there is no place for review of clemency on direct appeal, nor is there a civil rights claim as that is a civil action intended for damages for wrongful denial of one's rights.  Such an action does not life for one whose conviction may be upheld, nor can one obtain a stay of execution for a problem with the clemency process after habeas review as that would run afoul of the doctrine of abuse of the writ.  Habeas exists to review constitutional claims, and if the right to seek mercy for one's life is not such a claim then this Honorable Court should say so and state that such things are beyond its review.

In *Ohio Adult Parole Authority v. Woodward*, 523 U.S. 272 (1998) the Supreme Court determined that at least some "minimal" due process requirements do apply to

executive clemency procedures.  The Supreme Court has **never** determined what protections are available under an Equal Rights claim.

Under the current rules in use by the Board, there is no prohibition against race being a consideration in the decision to grant mercy, nor is there any prohibition against consideration of gender, religion, national origin, or anything else that would seem manifestly improper. The current system permits the Governor to act to grant a life commutation only if the Board of Pardons and Paroles [a board he appoints] votes to recommend commutation to a life sentence.  Although at one time in the past the Governor could act directly upon such applications, apparently the risk that they might be granted was too great, and the current system evolved.  The meetings are closed, often conducted by fax, the Petitioner has no opportunity to be present, and no one may know how or why the Board reached its inevitably negative decision.

The Board does not conduct its business under a procedure that is race neutral, even facially. If one looks at statistics, [again difficult to obtain due to the Board's secretive nature] it appears the number of black applicants in capital cases who have been granted a commutation to life under this current system is at the statistically significant number of zero.  Since racial discrimination has no place in the criminal justice system, even in its few grants of mercy, this claim should be reviewed under the disparate treatment analysis of *Bush v. Gore*, 531 U.S. 98 (2000).  At the very least, their procedures should be reviewed under a Fourteenth Amendment analysis, ala *Batson v. Kentucky* for discrimination in application.

This is an equal protection claim under the Fourteenth Amendment.  Due to the arbitrary and discriminatory nature of the clemency process in Texas, the Petitioner will

suffer cruel and unusual punishment as prohibited in the Eighth Amendment since he will not be given a fair opportunity for his commutation petition to be reviewed because the process discriminates against African-Americans. Under *Bush v. Gore*, 531 U.S. 98 (2000), once a state grants a fundamental right it cannot later, by arbitrary and disparate action, value one person's rights over another.

The Petitioner deserves a fair forum to present any petition for mercy, not a system that provides the illusion of a chance. If the past history is any indicator, his potential to obtain a commutation is zero. The only person in a capital case so far to obtain such relief to the Petitioner's knowledge was a white male who had multiple killings under his belt. If such a chance does not exist for the Petitioner then it violates the equal protection of the law under the Fourteenth Amendment.

The Petitioner has significant evidence of organic brain damage and crippling mental illness, youth, and tragic abuse at the hands of both his family and the men his mother allowed into their home. These facts make for a compelling story for mercy. He deserves a fair place to present those claims for commutation. In its current form, the Board of Pardons and Paroles does not represent a place where a man can get a square deal. This claim should merit additional fact finding and relief from this Honorable Court.

**CLAIM J**
**THE PETITIONER FAILED TO RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL TO WHICH HE WAS ENTITLED WHEN THE APPELLATE COUNSEL FAILED TO DEVELOP MERITORIOUS CLAIMS ON DIRECT REVIEW.**

Under *Evitts v. Lucy*, 469 U.S. 387, 401 (1985), when a state provides for appeal and counsel on appeal, the appellant is entitled to effective assistance of counsel, extending the doctrine of *Strickland v. Washington*, 466 U.S. 668 (1984) to direct review.

At the punishment charge conference, the trial counsel went to great pains to detail the following objections:

1) A request for instructed verdict or a charge on the actual mental age of the Petitioner, which was ten, based upon the reasoning in *Roper v. Simmons*, id.

2) An instructed verdict on the issue of future danger

3) An instruction that society meant prison society under *Berry v. State*

4) An instruction regarding residual doubt as mitigation

5) A requested instruction for a burden on proof for the State to prove there are no mitigating circumstances

6) An objection to the instruction that the jury should consider all the evidence that mitigates for or against the death penalty in answering the future danger issue, then the party charge issue on 37.071, and then the mitigation special issue, [all three Special Issue questions, essentially]

7) A request that "the age, …mental condition.." of the defendant/Petitioner be considered [in essence a re-wording of the standard charge to include specific mitigating factors]

8) A request that the charge include the choice of a "life sentence without parole" as the alternative to the imposition of death

9) A request to remove the language and phrase of "moral blameworthiness" from the charge;

All of these were denied, although the trial court did remove some language regarding what mitigates for and against the death penalty. [See Charge conference, RR- 33-154-180].

There was also a discussion and objection to the failure to include an accomplice witness charge for the extraneous offenses introduced by the State, offenses which would have likely had a severe impact on the jury's deliberations regarding all three questions. [See RR-34-8]

None of this was brought up on direct appeal. As such, the Petitioner believes that this failure to raise and argue meritorious claims for relief which would directly affect the verdict of death should result in relief for the Petitioner either individually or as a cumulative whole. See *Evitts v. Lucy*, id.

Beginning with the last issue, that of the requested accomplice witness charge [the State's evidence of Dexter's participation in almost all of the extraneous offense they brought forward was based upon the testimony of his co-actors, several of whom were the same individuals who testified at guilt innocence and who had cut deals with the State!] , the law on this topic within Texas is as follows:

Authority holds that a conviction may not rest upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979). The other evidence contemplated need not directly link the accused to the crime or establish his guilt beyond a reasonable doubt. *McDuff v. State,* 9393 S.W.2d 607, 613 (Tex. Crim. App. 1997). It need only tend to connect him to the offense. *Id.* at 613. In addition, the phrase "tending to connect" has been interpreted as "'to serve, contribute or conduce in some degree or way . . . to have a more or less direct bearing or effect,' and while not contemplating conjecture, 'has a tendency to prove the averments in the indictment.'" *Holladay v. State*, 709 S.W.2d 194, 198 (Tex. Crim. App. 1986), *quoting Boone v. State*,

235 S.W. 580 (Tex. Crim. App. 1922); *In re C.M.G.*, 905 S.W.2d 56, 58 (Tex. App.-Austin 1995, no pet.).

This standard does not present a high threshold but simply reflects a legislative determination that accomplice testimony should be viewed with some caution. *In re C.M.G.*, 905 S.W.2d at 58. More importantly, each case must be decided upon its own facts and circumstances. *Reed v. State*,744 S.W.2d 112, 126 (Tex. Crim. App. 1988). Next, an accomplice is someone who participated in the crime before, during, or after its commission. *McFarland v. State*, 928 S.W.2d 482, 514 (Tex. Crim. App. 1996); *In re A.D.L.C.*, 598 S.W.2d 383, 385 (Tex. App.-Amarillo 1980, no writ). Moreover, participation requires the performance of an affirmative act to promote its commission. *McFarland v. State*, 928 S.W.2d at 514.

Yet there is also a critical Eighth and Fourteenth amendment component to this claim as well.  The jury which was going to decide life or death based upon their answers to the questions of future danger, party liability, and the presence of mitigation should not have heard evidence from fellow actors without the caution of an accomplice witness instruction.  Their answers and determination should not have been made in a vacuum, and the instruction was crucial to fair and individualized determination of death. *Furman v. Georgia*, 408 U.S. 238 (1972).  It is particularly egregious when one considers that the guilt charge included an accomplice witness charge, but the decision on death was not so guided! [CR-Vol. III-538]

Likewise the objections to the various languages in the charge and to the presence of confusing instructions throughout the charge [see punishment charge attached to

application] should have been given full attention.  Under *Roper v. Simmons,* id, it is a logical extension of the doctrine of limited culpability that those whose physical age was quite close [only a few days over eighteen] and whose mental age was actually much younger to be given the same protection against the imposition of the ultimate sanction. The failure to argue this on appeal constitutes a failure in the duty of appellate counsel. All indigent criminal appellants are entitled to legal representation from "attorneys who can provide specified types of assistance---that is, that such appellants have a right to effective assistance of counsel." *Evitts v. Lucey,* 469 U.S. 387, 404--05,  83 L.Ed.2d 821 (1985); *see also Ward v. State,* 740 S.W.2d 794, 800 (Tex.Crim.App.1987); *see generally Ex parte Jarrett,* 891 S.W.2d 935 (Tex.Crim.App.1994). "Appellate counsel has a duty to raise every non-frivolous issue," *Jones v. Barnes,* 463 U.S. 745, 751,  77 L.Ed.2d 987 (1983); *see also Stafford v. State,* 813 S.W.2d 503, 511 (Tex.Crim.App.1991), regardless of the limitations of Rule 40(b)(1), TEX.R.APP. P. *Fowler v. State,* 874 S.W.2d 112, 114 (Tex.App.---Austin 1994, pet. ref'd). For example, under *Flowers v. State,* 935 S.W.2d 131, 134 (Tex.Crim.App.1996), a defendant who fails to comply with Rule 40(b)(1) *may still appeal the voluntariness of his negotiated plea.*

Here, almost all of these issues would have had a serious impact on the deliberations of the jury because they would have materially impacted the guidance they received on their decisions.  Regarding the residual doubt as mitigation instruction, the Court denied the submitted charge. (See clerk's record, Vol. 3, pg. 605)  The definition as asked requested that the jury be "free to consider any residual doubt you may have, whatever degree, as mitigation in answering the third special issue."  Mr. Johnson should be entitled to this instruction under *Skipper v. South Carolina,* 476 U.S. 1, 4 (1986) and

*Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  As an example, a juror can determine the elements of the offense and return a guilty verdict, thus indicating that they have no more reasonable doubts, but they still harbor residual doubts or shades of uncertainty that should be permitted under the Eighth Amendment to be expressed as part of the jurors reasoned moral response to the issue of death.  A failure to give such an instruction would violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

The other objected to issues included a request to delete the extremely confusing language on each of the questions as posed by trial counsel Osso, was specifically intended to avoid the risk of confusion to a jury as the nullification instructions were determined by the Supreme Court to have done just that.  See *Penry v. Johnson*, 121 S. Ct. 1910 (2001) and *Penry v. Lynaugh,* 492 U.S. 302 (1989).  The language required that the jurors assess all the evidence for and against the imposition of death ("that mitigates for or mitigates against") on each of the three special issues under Article 37.071.  In fact the modern charge (see attached) actually does run perilously close to creating a "modified nullification" instruction since it specifically exhorts each juror to examine all the evidence for and against the death penalty in answering each of these questions.  The problem with this is it truly does create an undue risk of other evidence coming in to the jurors answers in each and every one of the three special issues applicable to Mr. Johnson.   The failure to pursue this potential confusion is a deprivation of Sixth Amendment counsel as contemplated under *Evitts v. Lucy*.  As another point the defense counsel's objection to the inclusion of the word moral blameworthiness is a well taken point in that it interjects a vague and ill defined term which cannot be subject to a

"standard definition" since there is none in either Webster's Dictionary or any other comparable thesaurus.  If a "common meaning" is unattainable, then the Court should either remove it from the jury's consideration or define it; it did neither here and so again, created an inherent intention in the instructions to a capital jury that created an undue risk of death.

Appellate counsel failed to raise any of these issues on the brief.  It was clear that trial counsel contemplated preservation of these issues by their care and diligence.  While reasonable jurors and attorneys may disagree as to the ultimate resolution of these questions, the Appellate counsel's duty was to raise every non-frivolous issue that could save his client's life.  In order to maintain the validity of these issues, it is unfortunately necessary to question the Appellate counsel's decision in this claim.

## CLAIM K

**SINCE THE CONVICTION OF THE DEFENDANT THE COURT OF CRIMINAL APPEALS DECIDED *RUFFIN V. STATE*, WHICH AFFORDED A DEFENDANT AN OPPORTUNITY TO REBUT THE PRESUMPTION THAT HE POSSESSED THE CULPABLE MENTAL STATE OR INTENDED THE RESULTS OF HIS ACTIONS.  THIS DEFENSE WAS UNAVAILABLE TO HIM AT TRIAL, BUT SINCE HIS CONVICTION IS NOT YET FINAL HE SHOULD BE GRANTED RELIEF AND PERMITTED THE CHANCE TO OFFER THIS EVIDENCE TO REBUT THE ISSUE OF INTENT IN HIS CASE IN CHIEF.**

"Texas law, like that of all American jurisdictions, presumes that a criminal defendant is sane and that he intends the natural consequences of his acts." ***Ruffin v. State***, 270 S.W. 3d, 592 (Tex.Crim.App. 2008).  Further, Texas does not recognize diminished capacity as an affirmative defense, i.e., a lesser form of the defense of insanity. *Jackson v. State*, 160 S.W.3d 568, 573 (Tex.Crim.App. 2005).(fn5) Evidence of a mental disease or defect may be offered to rebut or disprove the State's evidence establishing the defendant's culpable *mens rea*. *Ruffin*, 270 S.W.3d 586; *Jackson*, 160

S.W.3d at 574-75. As with other evidence, it is up to the jury to hear the evidence, determine its weight, and decide whether Appellant possessed the requisite *mens rea* to commit this offense. *Id.* at 574.

Under the Eighth, Fourteenth, and Sixth amendments, this claim should merit relief as it directly relates to the ability to present a defense.  Prior to *Ruffin* the law was not at all clear that one could use one's own impairments [and the Petitioner herein has many, including organic trauma to his brain, likely PTSD, and schizophrenia, all of which were shown at punishment, but not at guilt or innocence!] See attached reports of imaging by River Oaks, and attached jail records indicating severe psychological impairments, and the testimony at punishment of Dr. Gur, Watson, et al. Now that the CCA has decided that such evidence IS in fact proper to offer, and has decided it prior to Mr. Johnson's conviction being decided on direct review, it is only proper that he be given a chance to go back and present such evidence to a new jury on guilt/innocence in order to be able to present a proper defense.  Any trial counsel would have likely considered presenting such extensive evidence of impairment as it affected the culpable *mens rea*, and this case would be, and should have been, no different, had it only been an option for the defense!  This claim should merit relief for the Petitioner.

## CONCLUSION

This Court should grant relief for Mr. Johnson as there is ample evidence that his inherent damage and mental limitations should place him among that category of individuals to whom the twin purposes of retribution and deterrence that underlie the rational basis for the death penalty do not apply.  He should also be granted relief and be free from his death sentence because the Texas sentencing scheme violates the 8th and 14th amendments as determined by recent cases from the Supreme Court of the United States, and because his statements were not taken voluntarily, but were in fact coerced from an impaired individual, and because those same impairments prevented him from forming the requisite intent to commit the crimes for which he was convicted.

PATRICK F. McCANN
909 Texas Ave #205
Houston, Texas 77007
Bar # 00792680
713-223-3805
713-226-8097 FAX

## CERTIFICATE OF SERVICE

I hereby affirm a true and correct copy of the foregoing was delivered to the opposing counsel for the State Attorney General's Office via first class mail on

6/28/11 _____, at Capitol Station, Austin, Texas 77002, atn/Writs.

Counsel

## VERIFICATION

I hereby affirm that all the foregoing allegations are true and correct.

_____
AFFIANT

_____
DATE

SUBSCRIBED AND SWORN TO BEFORE ME

_____
NOTARY PUBLIC FOR
THE STATE OF TEXAS

**VERIFICATION**

I hereby affirm that all the foregoing allegations are true and correct.

_MBM McCann_

AFFIANT

_6/28/2011_

DATE

SUBSCRIBED AND SWORN TO BEFORE ME

GIULIANA PAULINA SISSON
Notary Public, State of Texas
My Commission Expires
September 30, 2014

_Giuliana Sisson 6/28/11_

NOTARY PUBLIC FOR
THE STATE OF TEXAS

58