# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

DEXTER JOHNSON,                    §
                                  §
        *Petitioner*,              §
                                  §
v.                                §          CIVIL ACTION H-11-2466
                                  §
WILLIAM STEPHENS, Director,        §
*Texas Department of Criminal Justice*, §
*Institutional Division*,          §
                                  §
        *Respondent*.              §

## MEMORANDUM OPINION AND ORDER

In 2007, a Texas jury convicted Dexter Johnson of capital murder.  After exhausting state appellate and post-conviction remedies, Johnson filed a federal petition for a writ of habeas corpus. Dkt. 1.  After Respondent William Stephens filed an answer, Johnson moved to abate these proceedings or amend his habeas petition.  Dkt. 14.  After reviewing the pleadings, the record, and the applicable law, the Court denies Johnson's pending motion and all but one claim in Johnson's federal habeas petition.

## I. BACKGROUND

Johnson's capital conviction and death sentence arise from the murder of 23-year-old Maria "Sally" Aparece during the course of a robbery.  When her parents returned home from seeing a movie on June 18, 2006, they waved at Ms. Aparece who was making a Father's Day card in her bedroom.  A little after midnight, Ms. Aparece left in her Toyota Matrix to meet her boyfriend, Huy Ngo.  No one heard from her again.

For the next two days, Ms. Aparece's parents assumed that she was staying with a friend. Her father eventually reported her disappearance to the Sugar Land police department. He also checked her credit card records and found that someone had repeatedly used her card, overdrawing her account.

Fort Bend County Police Detective Everett Hargrave began to investigate Ms. Aparece's disappearance. His investigation revealed that, hours after she left her house, surveillance video had captured two men using Ms. Aparece's credit card across town from her home. A separate police investigation by the Humble Police Department recovered Ms. Aparece's car at an apartment complex on June 20, 2006.

The next day, the Humble police responded to a report that Johnson's 14-year-old girlfriend had run away. When they arrived at her mother's apartment, which was in the same complex where the police had found Ms. Aparece's car, Johnson was there. After the police found marijuana and a shotgun in the apartment, they tried to arrest Johnson. He fled, but was soon apprehended.

The confluence of finding Ms. Aparece's car and Johnson's arrest led the police investigation down a path that uncovered the story of what had happened the night she disappeared. Detective Hargrave and fellow officer Bruce Campbell traveled to the Humble Police Department on the afternoon of June 21, 2006, to interview Johnson. Johnson waived his rights orally and in writing. Over the next four hours, Johnson admitted to participating in various crimes, many of which involved his friends Ashley Ervin, Louis Ervin, Keithron Fields, and Timothy Randle. In the portion of his interview admitted at trial, Johnson denied having any knowledge of Ms. Aparece's disappearance, but claimed that he found her credit cards on the ground. He eventually "admitted his involvement in the aggravated robbery of the couple, and he had named his accomplices." *State*

2

*v. Johnson*, 2010 WL 359018, at *5 (Tex. Crim. App. Jan. 27, 2010) (unpublished).  Johnson

described how he, along with the Ervins, Randle, and Fields, robbed the couple and stole their car.

Johnson "still maintained that, when he drove away in [Ms. Aparece's car] with Louis [Ervin] and

Fields, he left the couple standing on the street, unharmed."  *Johnson*, 2010 WL 359018, at *5.

During the interview, however, the police ignored Johnson's attempt to invoke his right to silence.

The police stopped interviewing Johnson shortly after he asked for an attorney.

The police later arrested Randle and another friend named Alvie Butler.  After about 20

minutes of questioning, Randle agreed to take the police to the decomposing bodies of the two

victims.  Both had died from gunshot wounds, later determined to have come from a .25 caliber

automatic firearm.  Ms. Aparece's body was unclothed.

The police began interviewing Johnson's friends separately.  The Court of Criminal Appeals

summarized the version of events revealed by the police interviews:

> [I]n the early morning hours of Sunday, June 18, 2006, [Johnson], Ashley Ervin
> (Ashley), Louis Ervin (Louis), Keithron Fields, and Timothy Randle were riding
> around in Ashley's black Nissan Sentra, looking for someone to rob.  They eventually
> came upon Aparece and her boyfriend, Huy Ngo, sitting inside Aparece's blue
> Toyota Matrix, which was parked down the street from Ngo's house.  Holding a
> shotgun, [Johnson] stood outside the driver's door and threatened to shoot Aparece
> through the window if she did not open the door.  When she complied, he threw her
> into the back seat of the Matrix, while Fields, who had been standing outside the
> passenger's door, did the same with Ngo.  Louis climbed in next to Aparece and Ngo,
> [Johnson] climbed into the driver's seat, and Fields climbed into the front passenger
> seat.  [Johnson] then drove around, demanding money from Aparece and Ngo.
> Ashley and Randle followed in the Sentra.  Eventually, both vehicles stopped near
> a wooded area.  Fields forced Ngo out of the car.  [Johnson] then raped Aparece in
> the car while Fields held a gun to Ngo's head and taunted him about what [Johnson]
> was doing to his girlfriend.  [Johnson] and Fields then marched Aparece and Ngo
> into the woods and shot them each in the head.
>
> [Johnson] and Fields took the Matrix back to their apartment while the Ervins and
> Randle followed in the Sentra.  On the way, they stopped at a gas station and used

Aparece's credit card to buy gas for both vehicles.  In the following days, [Johnson] used Aparece's credit card to make additional purchases.

*Johnson*, 2010 WL 359018, at *1 (footnote omitted).

On June 22, 2006, Johnson participated in a second police interview, this time conducted by Houston Police Department Detective Clement Abbondondalo.  The Texas courts had not yet appointed him an attorney.  Johnson confirmed many of the events described by his co-defendants, though he placed much of the blame on Randle.  Johnson admitted to ordering the couple out of the car with a shotgun and driving Ms. Aparece's car during the robbery.  He confessed that he raped Ms. Aparece.  He acknowledged that he fired the shotgun after taking the two victims back into a grassy area, though he claimed that he only intended to scare the couple.  He conceded that he had fired a .25 pistol into the ground one time.  He doubted that he hit anyone with the gunshot, but said the shot may have hit the male victim.  He pinned Ms. Aparece's murder on Randle.

The State of Texas charged Johnson with intentionally causing the death of Maria Aparece during the course of robbery.  The State's case against Johnson rested primarily on Louis Ervin's testimony and Johnson's two police statements.  The prosecution also emphasized that after the murders Johnson bragged that he "had to go ahead and off them people," because "they didn't want to give him no money."  He then said that "killing people is what he do."  Tr. Vol. 24 at 102, 106, 113.[1]

---

[1] The state court proceedings in this case resulted in a voluminous record.  The Court will cite the Clerk's Record containing trial court motions and docket entries as Clerk's Record Vol. ___ at ___.  The record contains two additional volumes of the trial record, but the Court will cite to only one as Supplemental Clerk's Record at ___.  The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___.  The Court will refer to the record from Johnson's state habeas proceedings as State Habeas Record at ___.  Respondent provided the Court with copies of Johnson's videotaped and audiotaped interrogations.  The Court will cite to them by their trial exhibit number.

4

Johnson's trial defense tried to portray him as the duped scapegoat for his accomplices, who were the real murderers.[2]  The jury instructions allowed for his conviction for capital murder, along with the lesser-included offenses of felony murder and aggravated robbery.  Clerk's Record Vol. 3 at 530, 533-36.  The jury could convict him of capital murder as the gunman, as a party, or as a conspirator to the offense.  Clerk's Record Vol. 3 at 532-33.  The jury convicted him of capital murder.

Texas law decided Johnson's fate through the jury's answers to three special issue questions:

<u>Special Issue No. 1</u>

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant Dexter Darnell Johnson, would commit criminal acts of violence that would constitute a continuing threat to society?

<u>Special Issue No. 2</u>

Do you find from the evidence beyond a reasonable doubt that Dexter Darnell Johnson, the defendant himself, actually caused the death of Maria Aparece, on the occasion in question, or if he did not actually cause the death of Maria Aparece, that he intended to kill Maria Aparece or that he anticipated that a human life would be taken?

<u>Special Issue No. 3</u>

Do you find from the evidence taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, Dexter Darnell Johnson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

Clerk's Record Vol. 3 at 563-65

---

[2]        James Leitner and Anthony Osso represented Johnson at trial.  The Court will refer to Johnson's attorneys conjunctively as "trial counsel."

The punishment phase showed that the victims' murder was only one episode in an escalating pattern of lawlessness. Often in the company of his friends, Johnson had committed numerous aggravated robberies. He had kidnaped and robbed others in a similar fashion to Ms. Aparece's abduction. The day after the murder Johnson committed a robbery while driving Ms. Aparece's car. Importantly, the State relied on "the most powerful imaginable aggravating evidence," that Johnson had killed before. *Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 391 (2009). In total, Johnson had taken part in three additional killings during the same time period as Ms. Aparece's murder. Given that history of lawlessness, Johnson's attorneys faced a difficult challenge in defending against a death sentence.

The defense called several witnesses in the punishment phase to mitigate against a death sentence and show that Johnson would not be a future danger. Family members testified about his childhood and upbringing, describing his youth as full of "poverty and chaos." Tr. Vol. 34 at 62. Mental health experts explained that Johnson had low intelligence, brain damage, a childhood speech impediment, difficulties learning, and mental illness. The defense tried to minimize Johnson's involvement in other crimes.

The jury's answers to the special-issue questions resulted in a death sentence. After unsuccessfully availing himself of state appellate and habeas review, Johnson filed a federal petition for a writ of habeas corpus raising the following claims:

A. The police continued questioning Johnson after he exerted his right to counsel in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).

B. The Constitution should prohibit the execution of a severely mentally ill inmate.

C.   Texas' capital sentencing scheme violates the Eighth and Fourteenth Amendments by confusing jurors between aggravating and mitigating elements.

D.   The future dangerousness special issue does not provide adequate guidance to help the jury understand its relationship to the other special issues.

E.   The mitigation special issue prevents jurors from giving effect to a defendant's mitigating evidence.

F.   Johnson was not mentally competent to waive his rights during the custodial interview with the police.

G.   Texas violates the Eight Amendment and Equal Protection Clause by enforcing the death penalty in a racially discriminatory manner.

H.   The State of Texas violated Johnson's equal protection rights under *Bush v. Gore*, 531 U.S. 98 (2000) because of disparate treatment due to his race.

I.   Racial disparity in the clemency process violates *Bush v. Gore*, 531 U.S. 98 (2000).

J.   Appellate counsel failed to provide effective representation by not developing meritorious claims.

K.   A change in Texas state decisional law should require retrial of Johnson's guilt.

Respondent has filed an answer contending that federal law does not entitle Johnson to federal habeas relief. Johnson has filed a reply. Johnson has also filed a motion to abate this action and amend his habeas petition to include two new habeas claims.

## II. Legal Standards

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 780 (2011). Federal habeas corpus review provides an important, but limited, examination of state criminal judgments. Because "state courts are the principal forum for asserting constitutional challenges to state

convictions," *id.* at ___, 131 S. Ct. at 787, concerns for comity, federalism, and finality define the contours of federal habeas corpus. *See Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Accordingly, federal jurisprudence sets high procedural hurdles to federal habeas review. If an inmate has presented his claims in a manner allowing the state courts to rule on their merits, the Anti-Terrorism and Effective Death Penalty Act prohibits inmates from "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. ___, 130 S. Ct. 1855, 1866 (2010); *see also Parker v. Matthews*, ___ U.S. ___, 132 S. Ct. 2148, 2149 (2012). The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, ___ U.S. at ___, 131 S. Ct. at 784. Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)).[3] "The question under [§ 2254(d)] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Hardy v. Cross*, ___ U.S. ___, 132 S. Ct. 490, 495 (2011) ("Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.").

---

[3]      The Supreme Court has clarified that relief lies under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1174 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

AEDPA deference also limits a federal habeas court's ability to allow new factual development. *See* 28 U.S.C. § 2254(e)(2). The Supreme Court has recently "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011). Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at ___, 131 S. Ct. at 1399, 1400. Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review" and this Court's review "is limited to the record in existence at [the time of the state court decision] *i.e.*, the record before the state court." *Id.*; *see also Bobby v. Dixon*, ___ U.S. ___, 132 S. Ct. 26, 27 (2011).

A petitioner's compliance with the AEDPA alone does not entitle him to habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003). Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, restrict federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). This Court cannot issue the writ unless error "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). Also, under the jurisprudence flowing from *Teague v. Lane*, 489 U.S. 288 (1989), a habeas court cannot grant relief if it would require the creation and retroactive application of new constitutional law. *See Horn*, 536 U.S. at 272.

With those standards in mind, the Court first turns to Johnson's pending motion to abate or amend. The Court will then address the claims Johnson raised in his federal habeas petition.

### III.  Motion To Abate or Amend

Nearly two years after Johnson filed this federal habeas action, he submitted a motion to abate this action or amend his federal petition. Dkt. 14. He wants the state or federal courts to adjudicate two claims that he has not raised before. Johnson does not provide extensive legal or factual argument relating to the two claims he proposes to raise. Instead, Johnson summarily states that his first putative claim would fault trial counsel for not "present[ing] any evidence whatsoever of [his psychological and biological mental] impairments during the guilt innocence of the trial" even though counsel had prepared such evidence for the punishment phase. Dkt. 14 at 8. Johnson asserts that his "long history of serious mental disability coupled with severe physical damage to [his] brain" would have allowed trial counsel to argue that he lacked the necessary intent to commit capital murder. Dkt. 14 at 8. Johnson's second proposed claim criticizes appellate counsel for not challenging trial counsel's representation on that ground.

Johnson did not advance these new claims in his state habeas application, though his habeas attorney was aware of the underlying mental impairments. During a state habeas hearing, habeas counsel summarily requested leave to develop the factual basis of ineffective-assistance-of-counsel claims relating to the guilt/innocence phase. Given Texas state habeas procedure that discourages

the late development of habeas claims,[4] the state habeas court limited judicial consideration to the issues Johnson had filed in his state habeas application.

When Johnson filed his federal petition he still did not argue that trial counsel should have presented evidence of mental impairment in the guilt/innocence phase. Johnson sought leave to introduce two new habeas claims into this action only after Respondent had filed the pending summary judgment motion and he had replied. Recognizing procedural hurdles to review at this late stage in the proceedings, Johnson proposes two vehicles to judicial consideration of the claims. Johnson asks the Court to stay the instant proceedings so that he can present the new claims to the state courts. Also, Johnson wants to amend his federal petition to include the new claims. For the reasons discussed below, the Court will deny his motion to abate or amend.

A.      Abatement

Federal law prohibits habeas relief on issues that an inmate has not first presented in state court. *See* 28 U.S.C. § 2254(b)(1). Johnson asks this Court to abate this action under *Rhines v. Weber*, 544 U.S. 269, 275 (2005) to allow state court consideration of his new claims as a precursor to federal review. In *Rhines*, the Supreme Court authorized a limited stay-and-abeyance practice that allows for the development of meritorious claims while preserving the AEDPA's concern for finality and expediency. *See id.* at 278. *Rhines*, however, hardly requires federal courts to stay every petition advancing unexhausted claims. *Rhines* only authorizes stay and abeyance when the petitioner shows:

---

[4]         Texas' statutory habeas procedure does not generally authorize the insertion of new claims late in a habeas case. If an inmate files any amendment outside of art. 11.071 § 4(a)'s time constraints, Texas law usually treats that pleading as a new habeas action. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(f) ( "If an *amended* or supplemental application is not filed within the time specified under Section 4(a) or (b), the court shall treat the application as a subsequent application under this section." ). Accordingly, inmates are essentially limited to state habeas review of the claims that they identify and brief in their initial habeas application unless they act quickly to amend.

11

(1) good cause for failing to exhaust the claim; (2) that the claim is not plainly meritless; and (3) that he has not intentionally engaged in dilatory tactics. *See id.* at 277.

Several factors discourage this Court from staying the current proceedings. First, *Rhines* prohibits the abeyance of federal proceedings when "a petitioner engages in abusive litigation tactics or intentional delay[.]" 544 U.S. at 278. As an equitable mechanism to ameliorate the AEDPA's harsh provisions, abatement should only be available when a petitioner shows diligence and alacrity in asking for such an extraordinary procedure. *Cf. In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) ("'Equity is not intended for those who sleep on their rights.'") (quoting *Fisher v. Johnson*, 174 F.3d 710, 715 (5th Cir. 1999)). An inmate seeking to advance unexhausted claims should request a stay early in the course of federal litigation, preferably by filing a "'protective' petition in federal court" and then expeditiously moving for a stay. *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005). Johnson filed his federal petition on June 28, 2011. Even though he admits that he knew about the putative claims during state habeas review, he did not advance them until December 28, 2012. By that time, both parties had extensively briefed the other legal and factual issues in this case. Pausing the federal action at this late date "frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings" and "also undermines AEDPA's goal of streamlining federal habeas proceedings[.]" *Rhines*, 544 U.S. at 277. The languid manner in which Johnson requested a return to state court discourages the granting of a stay.

Second, Johnson does not show good cause for failing to raise his unexhausted claims until federal review. Johnson's unexhausted claims apparently rely on easily discoverable factual predicates. Nothing inherent in the structure of Texas' post-conviction review thwarted him from advancing them in his initial habeas action. The record before the Court only shows that Johnson

12

did not raise certain claims in his habeas application – a circumstance that arises every time a capital petitioner includes unexhausted claims in his federal petition.

Third, federal law predicates the exhaustion doctrine, including the stay-and-abeyance safety valve, on the availability of state court remedies. *See* 28 U.S.C. § 2254(B)(1). Texas strictly enforces its abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5(a)) and generally prohibits the filing of successive habeas applications. While article 11.071 sanctions the filing of a successive state habeas application in three limited circumstances, Johnson does not establish that he can meet its demanding requirements.[5] Because Texas would apply its procedural law to prohibit the filing of a successive state application, staying Johnson's federal petition would insert needless delay into these proceedings. Johnson, therefore, has not shown entitlement to abatement under *Rhines*.

## B. Amendment

Alternatively, Johnson wants to introduce the new claims into his federal litigation by amending his petition. The federal rules allow pleading amendments with "leave of court" any time during a proceeding. *See* FED. RULE CIV. PROC. 15(a). A court "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). "'Whether leave to amend should be granted is entrusted to the sound discretion of the district court . . . [.]'" *Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 499 (5th Cir.1998) (internal citation omitted). Generally, federal practice "evinces a bias in favor of granting leave to amend," *Martin's Herend Imports v. Diamond & Gem Trading*

---

[5]     Article 11.071 § 5(a)(1) authorizes the filing of a successive application when the claims "have not been and could not have been presented previously . . . because the factual or legal basis for the claim was unavailable[.]" Johnson raises claims that he easily could have raised in his initial state applications. Sections 5(a)(2) and (3) require a persuasive showing of actual innocence, and which Johnson does not make. *See Ex parte Davis*, 947 S.W.2d 216, 237 (Tex. Crim. App. 1996) (finding that "[t]he 'actual innocence' standard embodied in Subsections 5(a)(2) and 5(a)(3) mirrors that for bringing successive writ applications in federal habeas review of state convictions").

*United States of America Co.*, 195 F.3d 765, 770 (5th Cir.1999) (quotation omitted), unless the district court has a "substantial reason" to the request. *Lyn–Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002). Courts general look to the following factors to decide whether leave to amend is appropriate: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and, (5) futility of the amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Priester v. JP Morgan Chase Bank,* 708 F.3d 667, 678 (5th Cir. 2013).

Respondent opposes the amendment of Johnson's petition at this late date. Respondent provides several reasons why federal procedure should disallow amendment, but most strongly argues that Johnson's motion is a "blatant attempt to delay these proceedings" that would be futile due to limitations on federal habeas review. Dkt. 15 at 21. Modern federal habeas law provides an important safeguard against constitutional deprivation, limited by a State's weighty interest in carrying out an otherwise-valid sentence. "Congress enacted AEDPA to advance the finality of criminal convictions." *Mayle v. Felix*, 545 U.S. 644, 662 (2005). Concerns for finality encourage inmates to file a single federal petition which must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." Rule 2(c) of the FEDERAL RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. Inherent in habeas practice, especially after the passage of the AEDPA, is an effort to make the capital process effective. Restarting the process at this stage would needlessly insert delay into the proceedings.

Even if the Court granted leave to amend, Johnson would face high procedural obstructions to federal habeas review and relief. The AEDPA employs a strict one-year limitations period that expired shortly after Johnson filed his federal petition. *See* 28 U.S.C. § 2244(d)(1)(A). Johnson has

not made a strong showing that equity should forgive his failure to include the new claims in his initial, timely federal petition.[6]  Even if Johnson could show an equitable exception to the AEDPA's limitations period, the exhaustion and procedural bar doctrines would prevent this Court from reaching the merits of his putative claims.  As Johnson has not made a convincing argument that he could overcome those procedural impediments, amendment would be futile.

Importantly, Johnson provides scant information about the claims he wishes to advance. Johnson has not pointed to what lay or expert testimony of a mental disease or defect would directly rebut the particular *mens rea* necessary for capital murder.  He has not marshaled the evidence to show how mental defects would measurably alter the jury's consideration of his intent in the robbery and murder of the victims.[7]  Without a stronger foundation, the Court has no reasonable basis to assess whether trial counsel should have focused his efforts on that theory, much less whether Johnson should have raised the issue at earlier post-conviction stages.  In other words, Johnson has not sufficiently shown that the denial of amendment at this stage would compromise his rights.  For those reasons, the Court will deny Johnson's motion to abate or amend his federal habeas petition.

---

[6]       While federal law allows any amendment to "relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading," FED. R. CIV. P. 15(c)(1)(B), amendment is not permissible if based on "a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth."  *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009) (relying on *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).  Johnson does not argue that his new claims relate back to any issue raised in his petition.  "New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision." *Gonzalez*, 592 F.3d at 680.  Johnson's challenge to trial counsel's guilt/innocence strategy differs fundamentally from his attack on the punishment-phase representation.

[7]       Johnson has also not discussed the interplay between the proposed claim and his assertion in claim K that the state courts would not consider such evidence at the time of trial.

## IV. ANALYSIS OF THE MERITS

### A.    Johnson's Police Statements (claim A)

On June 21, 2006, the police arrested Johnson on a misdemeanor possession of marijuana charge.  Over the next few days, the police interrogated Johnson twice for a range of violent crimes, including the capital murder for which he received a death sentence.  The police recorded both interrogations.  The prosecution played part of the videotape from the first interview, and all of the audio from the second, during the guilt/innocence phase of trial.  Johnson alleges that the trial court should have suppressed the audiotape of the second interrogation because, at the end of the first interrogation, he had unambiguously invoked his right to counsel.  As described below, even at this late stage several issues require additional development.

### 1.    Johnson's Two Police Statements

On June 21, 2006, Detectives Everett Hargrave and Bruce Campbell from the Fort Bend County Sheriff's Department, along with Detective Duke Caruthers from the Humble Police Department, interrogated Johnson.  The videotaped interrogation began at 4:16 p.m. and ended at 8:15 p.m.  Tr. Vol. 16 at 13-14, 30. Johnson twice invoked his constitutional rights in the first interrogation.  The facts followed the same pattern in both instances where Johnson had asserted his rights.  Johnson, after sitting quietly as if in contemplation, exerted his constitutional rights.  He immediately thereafter explained why he did so.[8]  The police then continued asking questions and Johnson responded.

---

[8]    The trial court found that Johnson's post-invocation statements explained *why* he wished to exert his constitutional rights.  In the first, he "told Detective Hardgrave that he wanted to return to his cell and he did not want to talk any more *because* he felt the officers were trying to 'pin this stuff on him.'"  Supplemental Clerk's Record at 8 (emphasis added).  In the second, he wanted an attorney "*because* he had already told everything including the names of his accomplices."  Supplemental Clerk's Record at 9 (emphasis added).

The first invocation of his rights came midway through the interview.  After one hour and 28 minutes of discussion, the police officers implored Johnson to "help them out."  Johnson said that he wanted to "go back to his cell" and "didn't want to talk no more."  Without a break, however, Johnson continued talking and complained that it "seem[ed] like" the police were "trying to pin this stuff on him . . . ."  The detectives interrupted him and continued their questioning.

Even though Johnson responded to the police's continued questions, the trial court found that Johnson had unambiguously invoked his right to remain silent.  Tr. Vol. 17 at 120; Supplemental Clerk's Record at 20.  When Johnson did so, the police were under an absolute obligation to "scrupulously honor" the right to remain silent and to cease all questioning immediately.  *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).  Because of that invocation, the State did not admit the remaining portion of the first interrogation into evidence at trial.

The police officers' conduct during that unadmitted portion of the interview, however, called the second interrogation into question.  Toward the end of the first interrogation the police again ignored Johnson as he exercised his constitutional rights.  For a long period, Johnson slouched in his chair and sat quietly as the police officers repeatedly urged him to tell the truth because his co-defendants would turn on him.  Detective Hargrave said that he intended to end the interview, but maintained that Johnson had not fully divulged his role in the murder.  Detective Hargrave also told Johnson that he could only hope for a deal with the District Attorney's Office if he completely disclosed his full involvement and was "trying to be right about this[.]"[9]  Johnson sat quietly and then, apparently frustrated and repeatedly shrugging, invoked his right to counsel in the following conversation, as transcribed by the Court of Criminal Appeals:

---

[9]        This statement begins at 3:59 of State's Trial Exhibit 2 ("SX2").

Johnson:      I'm trying, I'm trying, I'm trying to be right, I'm trying to [incomprehensible] you [incomprehensible] for all I know. That's all I know right now. *I don't even want to talk no more until I get me a lawyer or something.* Because I, I, I keep on telling y'all, I done told y'all everything. I wouldn't have gave up them names if I didn't know everything I knew. I'm not, I'm not no rat, no little snitch like that. I done told y'all everything I knew though. That's everything right there. I'm not going to, come on now.

Campbell:     [from the side] What do you mean[10]

Johnson:      [interrupting, incomprehensible] – that's a snitch though –

[Campbell and (Johnson) incomprehensible, talking simultaneously.]

[Johnson]:    I gave up my brother. I told you what he did and I know he didn't kill her. He was in the car with me. Louis [was] in the car with me. We drove out.

Hargrave:     Yeah.

[Johnson]:    I told you everything that I know, so—

Hargrave:     Yes, but you also told us that you didn't take anyone away from the situation. You did. So someone -

[Johnson]:     [interrupting, incomprehensible] – I took somebody away.

Hargrave:     Huh?

[Johnson]:    So you saying I took somebody away?

Hargrave:     You and your crew.

Johnson:      I didn't take nobody away.

*Johnson*, 2010 WL 359018, at *6 (emphasis added). After a few more minutes of conversation, the police ended the interview.

_____

[10]      While indistinct, this Court's review of the video suggests that Detective Campbell asked, "What do you mean, 'rat'?" prompting Johnson's response that a "rat" is a "snitch." SX 2 at 3:59. Thereafter, Detective Campbell states, "I mean, I know what a rat is," as Johnson continues talking.

Various facts indicated that Johnson had not been forthright in his description of the crime, but the police were apparently concerned that he had made a valid invocation of his right to counsel. If a suspect such as Johnson "states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Thus under *Edwards v. Arizona*, such suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85 (1981).

The police apparently wondered whether they could resume interviewing Johnson. According to a trial motion filed by the defense, a police incident report relating to the interrogation included the following notation:

> We then returned to the Homicide office and briefed all investigators on the information learned. With this information the two Fort Bend County S.O. Detectives Sgt. Bobby Roberts and my partner and I proceeded to the Harris County District Attorneys Office and met with ADA Tammy Thomas *the circumstances of the case were relayed to her and the fact that Dexter Johnson had asked for an attorney during his interview with Fort Bend County S.O. Detectives, the question arose whether or not we could speak to the suspect because of how this occurred during their investigation.* She was provided a copy of the CD and reviewed its contents *she advised that the recording clearly shows that Suspect Dexter Johnson stating that he no longer wants to talk and asks for an attorney. [T]he suspect then continues to talk without stopping.* This was not provoked by the detectives and this indicates that the suspect re-initiated contact. *The suspect invoked his right to an attorney and then revoked it himself[.] [W]e were advised that we could speak to him.*

Clerk's Record Vol. 2 at 262 (emphasis added). Apparently, the district attorney's office believed that Johnson had made a clear request for counsel but, by continuing to talk immediately after invoking his rights, Johnson reinitiated conversation with the police. In other words, the assistant district attorney advised the police that Johnson had expressed "a desire . . . to open up a more

generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983).

On June 22, 2006, the State of Texas charged Johnson with aggravated robbery. In a court hearing that day, a judicial officer informed Johnson of his rights for both the aggravated robbery and the drug charge. Johnson requested a court-appointed attorney. Tr. Vol. 16 at 49.[11]

At around 8:00 p.m. that night, Detective Clement Abbondondalo of the Houston Police Department questioned Johnson at the Houston homicide division. Detective Abbondondalo testified in a suppression hearing that he was aware "[t]here was an issue" relating to Johnson asking for an attorney, but he thought that the "issue . . . had been resolved." Tr. Vol. 17 at 27-29. Johnson waived his constitutional rights at the beginning of the second interrogation. In a 22-minute discussion with Detective Abbondondalo, Johnson confessed to a greater involvement in the murders, including an admission for the first time that he had fired shots at the scene which may have hit at least one victim. He also admitted that he raped Ms. Aparece. After this statement and continued investigation, the State of Texas charged Johnson with capital murder. The prosecution presented the entirety of his audiotaped second interview at trial.

2.      The State Courts' Consideration of the *Edwards* Claim

Before trial, the defense filed motions seeking to suppress Johnson's two police statements on various grounds, including that he had exercised his constitutional rights. Clerk's Record at 490-94. With regard to the allegation that Johnson invoked his right to counsel in the first interview, the State made two primary arguments against the defense's motion to suppress: (1) his invocation of

---

[11]      The next day, a Harris County court appointed Adam Brown to represent Johnson on his misdemeanor marijuana charge. Tr. Vol. 16 at 67-68. The court, however, apparently did not appoint counsel on the aggravated robbery charge.

the right to an attorney was ambiguous and (2) the right to counsel is offense-specific and had not yet attached to a capital-murder charge.  Tr. Vol. 17 at 92-93.[12]  The State conceded that if the invocation was not "ambiguous certainly then yes it would be a violation that they continue to talk to him."  Tr. Vol. 17 at 106-07.

The trial court heard testimony and argument to decide whether to suppress Johnson's second statement.  The trial court held that "the statements are unambiguous in regards to his invocation of his right to remain silent and his invocation of his right to have an attorney."  Tr. Vol. 17 at 120.  The State agreed not to present that portion of the first interrogation that occurred after Johnson invoked his right to silence, leaving only the second statement subject to suppression.  The trial court denied the motion to suppress with regard to the second interrogation, but did not clarify on what legal theory it found the post-invocation statement admissible.  The trial court, however, informed the State: "I can see why you may say [the invocation of Johnson's right to counsel] was ambiguous. I don't agree with that[.]"  Tr. Vol. 17 at 121.

Subsequently, the state courts have provided inconsistent reasons for finding no constitutional violation despite his invocation of his right to counsel.  The trial court ordered the parties to provide written findings on suppression motion by June 4, 2007.  Tr. Vol. 17 at 120-21. The trial court, however, did not sign any findings or conclusions before trial.  On direct appeal, Johnson complained that the trial court should have suppressed all statements he made after invoking

---

[12]       The State's second argument had no basis in constitutional law.  In *Arizona v. Roberson*, 486 U.S. 675, 682-84 (1988), the Supreme Court made clear that the *Edwards* rule is not offense specific.  *See also McNeil*, 501 U.S. at 177.

21

the right to counsel.[13]  Also, Johnson argued that the trial court erred by not entering written findings and conclusions.  The State of Texas moved for the Court of Criminal Appeals to abate the appeal and allow the trial court to enter findings and conclusions.  After remand, the trial court signed the State's proposed findings justifying the denial of the suppression hearing.

The findings from the trial court expanded on, and somewhat differed from, the trial judge's statements made after the suppression hearing.  The trial judge had explicitly found that Johnson was unambiguous in asserting his right to counsel.  The post-trial findings agreed that Johnson "unambiguously invoked his Fifth Amendment right to counsel in the first recorded statement," but observed that his "statement contained several sentences uttered immediately after his comment about an attorney that could appear ambiguous."  Supplemental Clerk's Record at 19.  The findings stated that "the sentence regarding an attorney occurred during a lengthy monologue from [Johnson] in which he kept speaking for some time after using the word lawyer[.]"  Supplemental Clerk's Record at 9.[14]  The trial court found that "the length of the monologue and the continuation of speech after the use of the term lawyer was confusing and ambiguous to the officers."  Supplemental Clerk's Record at 9.  Based on that ambiguity, the trial court found that Detective Campbell had tried to clarify Johnson's intent: "[W]hen Detective Campbell attempted to clarify [Johnson's] request, [Johnson] spoke over Detective Campbell explaining that he was not a snitch[.]"  Supplemental Clerk's Record at 9.  At that point Johnson revoked his previous invocation of counsel by continuing to speak: "unsolicited, [Johnson] reinitiated contact with police by stating that he gave up his brother

---

[13]     The Court of Criminal Appeals specifically noted that Johnson did not raise any issue relating to the invocation of his right to remain silent.  *See Johnson*, 2010 WL 359018, at *4, n.5.

[14]     What the state habeas court labeled a "lengthy monologue," Supplemental Clerk's Record at 9, was in reality a short series of comments that lasted only a few moments.

and explaining how he knew Keithron Fields and Louis Ervin did not kill Ms. Aparece."
Supplemental Clerk's Record at 9-10.  Thereafter, Johnson "made no other mention about an
attorney and he did not specifically request an attorney."  Supplemental Clerk's Record at 10.  Also,
"Detective Campbell and Detective Hargrave did not attempt to dissuade or talk [Johnson] out of
a request for an attorney and he decided to continue speaking of his own volition."  Supplemental
Clerk's Record at 10.

       To summarize, the trial court's written findings described the following order of events.
Detective Hargrave tried to end the interview with Johnson.  Johnson explicitly invoked his right to
counsel, but continued talking.  Confused when he did not immediately cease talking after
mentioning the word "attorney," the police officers interrupted him in an effort to clarify whether
he had invoked his rights.  Johnson then initiated contact by returning to the substance of the earlier
discussion.  Thus,

>       [b]ecause [Johnson] reinitiated contact with police during the first recorded statement
>       by continuing to speak about the offense after mentioning the word lawyer and by
>       speaking over Detective Campbell about the offense, Officer Abbondondalo was
>       permitted to conduct another recorded interview with [Johnson] without the presence
>       of an attorney on June 23 2006.

Supplemental Clerk's Record at 19-20.[15]

       The trial court forwarded its findings to the Court of Criminal Appeals.  Even though
Johnson complained in a supplemental brief that the State's extensive proposed findings should carry

---

[15]       The Court of Criminal Appeals summarized the trial court's findings as follows:

Here, the trial court found that, during [Johnson's] statement to Hargrave, [Johnson] unambiguously
invoked his right to counsel, but then he kept talking.  [Johnson] also interrupted and spoke over a
detective before making another statement about the facts of the offense.  These findings are supported
by the record, and we afford them almost total deference.  The trial court concluded that, when
[Johnson] continued to discuss the offense without prompting, he initiated further communication.

*Johnson*, 2010 WL 359018, at *5.

no validity because the trial court signed them on the day they were filed, the Court of Criminal Appeals's order stated that it paid "almost total deference" to the lower court's order. *Johnson*, 2010 WL 359018, at *3.

The Court of Criminal Appeals agreed that Johnson had "invoked his right to counsel." *Id.* at *7. After reviewing the lower court's findings and transcribing the challenged portion of the first interrogation, the Court of Criminal Appeals resolved Johnson's claim as follows:

> When an accused of his own volition resumes talking after invoking his right to counsel, this conduct may constitute initiating further communication. *See, e.g., Etheridge*, 903 S.W.2d at 17–18.   Here, [Johnson] continued to talk without prompting.   In the context of Hargrave's earlier comment that he did not believe [Johnson] had told him everything, [Johnson's] post-invocation statement, insisting that he had told Hargrave everything and reiterating a prior statement about the facts of the offense, conveyed a willingness to talk about the investigation and constituted the initiation of further communication.   *See Edwards*, 451 U.S. at 484–85; *Cross*, 144 S.W.3d at 528.   Therefore the police were not prevented from approaching [Johnson] on a later date, provided that [Johnson] knowingly and intelligently waived his rights before further interrogation.
>
> . . .
>
> The record demonstrates that on June 21, 2006, [Johnson] invoked his right to counsel during his interview with Hargrave.   However, during that same interview, he initiated further communication.   Two days later, on June 23, 2006, [Johnson] knowingly and intelligently waived his right to counsel before he made his statement to Abbondondalo.   Hence, the trial court did not abuse its discretion by denying [Johnson's] motion to suppress his statement to Abbondondalo.   Point of error four is overruled.

*Id.* at *6-7.

Importantly, the Court of Criminal Appeals did not adopt the trial court's finding that Detective Campbell intended to clarify whether Johnson intended to invoke his rights.   In a footnote, the Court of Criminal Appeals commented:

> The State's appellate brief characterizes Campbell's words as an attempt to clarify [Johnson's] assertion that he did not want to talk anymore without a lawyer.   Our review of the audiovisual recording neither supports nor contradicts this

24

characterization.   It is apparent, however, that [Johnson] did not respond to Campbell's question but instead interrupted and spoke over Campbell, so that Campbell gave up.

*Id.* at \*6, n.6.

For the appellate court, there was no confusion that Johnson made a clear invocation of the right to counsel.  The Court of Criminal Appeals' decision centered on whether Johnson reinitiated contact with police officers.  The Court of Criminal Appeals noted that Johnson "expressed a willingness to talk about the investigation" when he said "he had told Hargrave *everything* and *reiterat[ed] a prior statement* about the facts of the offense."  *Id.* at \*6 (emphasis added).  The Court of Criminal Appeals' decision, however, lacks some clarity because Johnson said that he had told the police "everything" both (1) immediately after mentioning an attorney and (2) after Detective Campbell interrupted him.

With that background, and given the waiver of rights before the second interrogation, the Court of Criminal Appeals found no error in the introduction of the second recorded statement. In his federal habeas petition, Johnson contends that the introduction of his second police statement violated clearly established federal law because he had invoked his right to counsel.

2.      Clearly Established Federal Law

"[T]he *Edwards* prophylactic rule . . . limits the ability of the police to initiate further questioning of a suspect in *Miranda* custody once the suspect invokes the right to counsel." *Howes v. Fields*, ___ U.S. ___, 132 S. Ct. 1181, 1190 (2012).  "[A] suspect who has 'invoked his right to have counsel present . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless [he] initiates further communication, exchanges, or conversations with the police.'" *Thompkins*, ___ U.S. at ___, 130 S. Ct. at 2274 (quoting *Maryland v. Shatzer*, ___

U.S. ___, 130 S. Ct. 1213, 1219 (2010)).  The fundamental holding of *Edwards* is that "when counsel is requested, interrogation must cease[.]" *Minnick*, 498 U.S. at 153; *see also Roberson*, 486 U.S. at 680 ("The rule of the *Edwards* case came as a corollary to *Miranda*'s admonition that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present'"); *Shea v. Louisiana*, 470 U.S. 51, 52 (1985) ("In *Edwards v. Arizona*, . . . this Court ruled that a criminal defendant's rights under the Fifth and Fourteenth Amendments were violated by the use of his confession obtained by police-instigated interrogation – without counsel present – after he requested an attorney").  In fact, "not only must the immediate contact end, but 'badgering' by later requests is prohibited." *Montejo v. Louisiana*, 556 U.S. 778, 794-95 (2009); *see also McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991); *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).  Simply, "questioning must cease if the suspect asks for a lawyer[.]" *Davis v. United States*, 512 U.S. 452, 461 (1994).

When confronted with an alleged *Edwards* violation, courts engage in two inquiries: (1) did "the accused actually invoke[] his right to counsel" and (2) "if the accused invoked his right to counsel," did "he (a) initiate[] further discussions with the police, and (b) knowingly and intelligently waive[] the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citations omitted).  If a criminal suspect unambiguously asserts his right to counsel, the police must end all questioning until an attorney is available or until the suspect reinitiates the interrogation. *See Shatzer*, ___ U.S. at ___, 130 S. Ct. at 1219; *Davis*, 512 U.S. at 458.  However, if a defendant makes "an ambiguous or equivocal reference to an attorney," the police may clarify his request or continue the interrogation. *Davis*, 512 U.S. at 459-60; *see also Thompkins*, ___ U.S. at ___, 130 S. Ct. at 259-60.

Because *Edwards* created "a presumption of involuntariness" for subsequent waiver of *Miranda* rights, the burden of proof is generally on the Government. *Shatzer*, ___ U.S. at ____, 130 S. Ct. at 1220. The Court looks at the totality of the circumstances to determine if the police violated the suspect's constitutional rights. *See Edwards*, 451 U.S. at 486, n.9.

3.      Respondent's Arguments and Unresolved Issues

Respondent's motion for summary judgment provides three reasons to deny the *Edwards* claim. Respondent first asks the Court to find that Johnson's comments did not amount to an unambiguous invocation of his rights. Respondent then contends that Johnson reinitiated contact with police officers immediately after mentioning an attorney, allowing them to continue their questioning. Finally, Respondent argues that the admission of Johnson's second statement was harmless. Given the record and the parties' arguments, certain areas need additional development before the Court can adjudicate this claim.

a.      *Clear Invocation of Right to Counsel and Reinitiation of Communication*

From the start, Respondent relies on a different interpretation of the events than that outlined by the Court of Criminal Appeals. Respondent asserts that Johnson never made a valid invocation of his constitutional rights. Respondent argues:

> [N]otwithstanding the state court's incorrect conclusion to the contrary, Johnson's comment about an attorney during his first statement to police *was not an unambiguous invocation of his right to counsel*. In a long, rambling response to a statement by Detective Hargrave that Johnson needed to be completely honest if he wanted any leniency from prosecutors, *Johnson spoke briefly about getting a lawyer in the second sentence of an eight sentence monologue. Detective Campbell then attempted to clarify Johnson's request*, but Johnson interrupted with his statement "that's a snitch, though." *Campbell again attempted to clarify*, but Johnson once more spoke over him while explaining how he knew Ervin and Fields did not harm Aparece.

27

Dkt. 11 at 22 (emphasis added). Respondent's version of events raises concerns that need additional briefing. Detective Campbell interrupted Johnson a few moments after he mentioned an attorney. The Court of Criminal Appeals found Detective Campbell's statement unintelligible. Throughout the post-judgment process, the State has argued that Detective Campbell tried to clarify whether Johnson wished to waive his right to counsel. The Court of Criminal Appeals did not adopt or refute that theory. Respondent's advocation of that position, however, rests on the assumption that Johnson either had ambiguously mentioned an attorney or had already reinitiated communication. The parties will provide additional briefing regarding whether: (1) Johnson made an unambiguous invocation of the right to counsel; (2) the police tried to clarify his request; and (3) Johnson reinitiated communication with the police.

*Ambiguity in Johnson's Request for Counsel* - Both the trial court and the Court of Criminal Appeals found no ambiguity in Johnson's sentence mentioning his right to counsel. Respondent, however, still argues that "[a] reasonable officer in Detective Campbell's and Detective Hargrave's position would not have understood Johnson's statement to be a clear request for counsel." Dkt. 11 at 22. Respondent does not describe why the lower courts were wrong in finding an unambiguous exertion of his constitutional rights.

The trial court, but not the Court of Criminal Appeals, found ambiguity as Johnson spoke *after* asking for an attorney. The suppression hearing testimony contains no hint that Johnson confused the police as he spoke. No police officer expressed confusion at Johnson's statement in the suppression hearing. The recording suggests that the police officer just continued talking with Johnson as if he had not mentioned an attorney. Only later did the police worry that Johnson had

28

invoked his rights, and thus consulted with the District Attorney's Office.  Clerk's Record Vol. 2 at
262.

Still, the briefing to this point does not adequately discuss how Johnson's brief comments
immediately after mentioning an attorney, which seem to discuss *why* he was invoking his rights,
were bewildering to the police officers.  A reasonable interpretation of Johnson's comments is that
he tried to explain why he wished to speak with an attorney.  Johnson did not backtrack on his wish
for counsel to be present, but elaborated that it was "*[b]ecause* I, I, I keep on telling y'all, I done told
y'all everything."  His post-invocation comments included language suggesting that he intended to
end the discussion, not reinitiate it: "I done told y'all everything I knew though.  *That's everything
right there.  I'm not going to*, come on now."  These statements would seemingly support his request
to end the interrogation, not indicate a wish to continue discussions.  The trial court's findings after
remand recognized that Johnson said he wanted a lawyer "*because* he had already told them
everything[.]" Supplemental Clerk's Record at 9 (emphasis added).  The parties should discuss how
Johnson's whole statement which seemed to express why he wanted an attorney was ambiguous to
the police officers.

*Police Efforts to Clarify His Intent* - Assuming that Johnson was ambiguous in asking for
an attorney, Respondent argues that "Detective Campbell then attempted to clarify Johnson's
request." Dkt. 11 at 22.  The lack of an official transcribed copy of the all of the statements from the
interrogation has created some confusion.  The police did not testify in the suppression hearing about
the content of their statements on the videotape.  The trial court, nonetheless, found that "Detective
Campbell tried to clarify [Johnson's] request."  Supplemental Clerk's Record at 9.

This Court's review of the videotape suggests that Detective Campbell interrupted and wanted Johnson to clarify the use of the term "rat," not whether he wanted an attorney.  When Johnson said that it is a "snitch," Detective Campbell declared that he knew "what a rat is."  The police then did not ask any questions relating to whether Johnson wanted legal representation.[16]  The parties will discuss whether Detective Campbell tried to clarify Johnson's intent.

*Reinitiation of Contact* - Both the trial court and the Court of Criminal Appeals found that Johnson reinitiated contact with the police.  If Johnson unambiguously asked for an attorney, interrogation only could have resumed if Johnson "open[ed] up a more generalized discussion relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045; *see also Minnick v. Mississippi*, 498 U.S. 146, 147 (1990) (stating that "once the accused requests counsel, officials may not reinitiate questioning 'until counsel has been made available' to him").  The trial court found that Johnson initiated contact both by "continuing to speak after mentioning the word 'lawyer'" and by responding to Detective Campbell (who allegedly tried to clarify Johnson's statements).  Supplemental Clerk's Record at 19.  The Court of Criminal Appeals apparently found that Johnson expressed a willingness to continue, both by the words he spoke immediately after mentioning an attorney and his subsequent response to the police officers.  *See Johnson*, 2010 WL 359018, at *6 (finding that Johnson expressed a "willingness to talk about the investigation and constituted the reinitiation of further communication" by "insisting that he had told Hargrave

---

[16]        Nonetheless, Respondent's argument that Detective Campbell was instead trying to clarify whether Johnson invoked his constitutional rights can only discredit his *Edwards* claim if Johnson's statements before that point were ambiguous.   Once Johnson mentioned an attorney, further communication by Detective Campbell was constitutionally permissible only if (1) Johnson did not unambiguously waive counsel or (2) the sentences Johnson spoke after mentioning an attorney reinitiated contact with the police.  *See Smith*, 469 U.S. at 95.  Otherwise, Johnson's response that he "told [the police] everything" cannot have reinitiated communication with the police officers.  *See Smith*, 469 U.S. at 92 ("[A]n accused's post-request responses to further interrogation may not be used to case doubt on the clarity of his initial request for counsel.").

everything and reiterating a prior statement about the facts of the offense"). As previously noted, Johnson's comments seemed to carry an air of finality. Respondent has not adequately described how statements such as "I'm not going to . . ." and "I told you everything I know" express an intent to restart the interrogation. The parties will further discuss how Johnson's statements – both those explaining why he exercised his rights and those in response to Detective Campbell – manifested an intent to continue without legal assistance.

The Court observes that Johnson's invocation of his right to counsel does not exist in isolation from the entire interrogation. The State only put before the jury that portion of the first recorded statement that had happened before the police ignored Johnson's right to remain silent. The question of that constitutional violation is not raised by these proceedings. The Court, however, does not turn a blind eye to the fact that the police had already once disregarded Johnson's attempt to invoke his constitutional rights. The police continued the same pattern when Johnson asked to proceed only through legal counsel. Had the police scrupulously honored Johnson's invocation of his right to remain silent, the interrogation would have ended hours before he asked for an attorney. The parties have not fully briefed the question of how this pattern informs a review of the entire interrogation.

Questions remain as to whether the police scrupulously honored the invocation of Johnson's rights. The parties will provide additional briefing consistent with the concerns discussed by the Court.

> b.    *Harmlessness*

Respondent also argues that the admission of Johnson's post-invocation comments was harmless. In order to grant federal habeas relief under harmless-error review, the trial error must

31

have had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrhamson*, 507 U.S. 619, 637 (1993) (citation omitted). Johnson has only briefly responded to the harmlessness argument. The state habeas courts did not consider the question of harm, making this Court's review *de novo*. Johnson bears the burden of showing that the admission of the second statement harmed the defense, especially in light of the other evidence at trial.

Respondent argues that Johnson's "second statement was not heavily relied on in proving his guilt." Dkt. 11 at 27. Strong evidence showed that Johnson's role exceeded that he described in the portion of the first interrogation that came before the jury. Respondent, however, downplays the extent to which the prosecution relied on the recording of Johnson's second interrogation. The prosecutor in guilt/innocence closing arguments reminded the jury that Johnson had confessed to the robbery and the kidnaping. Tr. Vol. 26 at 16. The prosecutor also used Johnson's second statement to brand him a liar. Tr. Vol. 26 at 16. Importantly, the prosecutor referred to his police statements to show that he was "the mastermind behind all of this" and that "he's the leader. He runs this. He's in charge." Tr. Vol. 26 at 69. In a prosecution allowing for a conviction based on Texas' law of the parties, Clerk's Record at 532-33, emphasizing Johnson's leadership in the group would help secure his conviction.

Johnson's role in the murder would also play an important part in the jury's consideration of his sentence. The second special issue asked, in part, if Johnson "had anticipated that a human life would be taken" even if he himself did not kill. In the second interrogation, Johnson admitted that he had fired shots at the crime scene. While other evidence showed Johnson's culpability, "a confession is like no other evidence" and "is probably the most probative and damaging evidence that can be admitted against a criminal defendant[.]" *Goodwin v. Johnson,* 132 F.3d 162, 182 (5th

Cir. 1997) (citations omitted).  The parties have not discussed how the second police statement would have influenced the jury's consideration of the second special issue.  The parties will provide additional briefing on whether the admission of the post-invocation statements was harmless.  The Court will still address the remaining claims in Johnson's petition.

**B.      Eligibility for Execution (Claim B)**

Johnson argues that mental illness should exempt him from execution.  Punishment-phase testimony by Johnson's expert witnesses portrayed him as an individual suffering from low intelligence, brain damage, and paranoid schizophrenia.  Based on that testimony, Johnson describes himself as such a "severe case" that he could not "maintain a normal life without extensive psychiatric assistance and medication."  Dkt. 1 at 13-14.  Johnson argues that his mental illness makes him less morally culpable than other offenders, and thus his execution would not fulfill the twin purposes of the death penalty: retaliation and deterrence.  *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).  On that basis, Johnson asks this Court to bar Texas from carrying out his death sentence.

The Constitution does not recognize a categorical exemption from execution for all mentally impaired offenders.  Instead, the Constitution only prohibits the execution of someone whose mental illness renders them incompetent.  *See Ford v. Wainwright*, 477 U.S. 399 (1986).  Drawing comparison to *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Roper v. Simmons*, 543 U.S. 551 (2005), where the Supreme Court found that the Cruel and Unusual Punishment clause protects the mentally retarded and the young from the death penalty, Johnson apparently sees the Supreme Court taking steps along a path that leads to the same exemption for mentally-ill inmates.

33

The state habeas court denied this claim because the "Supreme Court has not extended *Roper* [*v. Simmons*] to offenders such as [Johnson], who were eighteen when they committed capital murder" nor "extended the holding in *Atkins* to protect the mentally ill[.]"  State Habeas Record at 292.  The Fifth Circuit has similarly found that the constitutional protections from *Roper* and *Atkins* do not extend to mental illness.  *See Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011); *see also ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Woods*, 155 F. App'x 132, 136 (5th Cir. 2005); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006).  Because a federal habeas court cannot create new constitutional law, *see Teague v. Lane*, 489 U.S. 288 (1989), this Court cannot extend the categorical exemptions in *Roper* and *Atkins* to all severely mentally ill inmates.

*Ford v. Wainwright* prevents the execution of an inmate who is unable to "understand the fact of his impending execution and the reason for it."  *Barnard v. Collins*, 13 F.3d 871, 876 (5th Cir. 1994).  Insofar as Johnson relies on *Ford* to prevent his execution because of severe mental illness without a showing of incompetency, *Teague* bars an extension of *Ford* to any mental disorders beyond incompetence to be executed.  Johnson has not argued that he is currently incompetent under the *Ford* standard.  As incompetency-to-be-executed claims do not become judicable until an execution becomes imminent, any *Ford* claim is presently unripe.  *See Panetti v. Quarterman*, 551 U.S. 930, 947 (2007); *Stewart v. Martinez–Villareal*, 523 U.S. 637, 644-45 (1998).

As the Constitution does not protect all mentally ill offenders from execution, and Johnson has not shown that he is incompetent to be executed, the state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

**C.      Texas' Capital Sentencing Scheme (Claims C, D, and E)**

Johnson raises three claims relating to Texas' means of deciding whether a capital defendant merits a death sentence.  As previously mentioned, a Texas jury must answer special issue questions to decide whether the death penalty is an appropriate punishment.  Briefing the claims conjointly, Johnson complains that (1) the special issues confuse a juror between aggravating and mitigating factors (claim C)[17]; (2) jurors receive no guidance on how the future-dangerous issue relates to the other special issues (claim D); and (3) the mitigating special issue does not provide a vehicle for meaningful consideration of an inmate's evidence (claim E).  The state habeas court denied all the claims.

The Constitution prohibits the arbitrary and capricious imposition of a death sentence.  *See Gregg*, 428 U.S. at 188.  States must narrow the class of defendants eligible for a death sentence, and allow sentencing juries to give individualized consideration to the defendant and the discrete circumstances of each case.  *See Johnson*, 509 U.S. at 360-61; *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  Thus, "the Eighth Amendment requires that a capital sentencing jury's discretion be guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty[.]"  *Buchanan v. Angelone*, 522 U.S. 269, 274 (1998) (internal quotation marks omitted); *see also Johnson v. Texas*, 509 U.S. 350, 362 (1993).  "So long as a state system satisfies these requirements, [Supreme Court] precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."  *Kansas v. Marsh*, 548 U.S. 163, 174 (2006).

---

[17]      Johnson argues that the future-dangerousness and mitigation special issues "work against each other," forcing the jury to "flounder[] about trying to determine whether one piece of evidence, such as mental illness, should be considered as mitigating or future danger evidence."  Dkt. 1 at 14-15.

Texas circumscribes the class of persons eligible for the death penalty during the guilt-innocence phase of trial. *See Lowenfield v. Phelps*, 484 U.S. 231, 245-46, (1988); *see also Tuilaepa v. California*, 512 U.S. 967, 971-722 (1994). Pursuant to statute, the jury must determine in the guilt/innocence phase of trial whether the defendant committed a murder in one of several narrowly defined circumstances. *See* TEX. PENAL CODE § 19.03. Then, the design of the special issues provides individualized penalty-phase consideration of additional aggravating and mitigating factors. Inmates have repeatedly asserted that Texas' special issue questions do not adequately guide a jury's deliberations. The federal courts have consistently found that the future-dangerousness and mitigating evidence questions satisfy constitutional requirements.

Specifically, federal courts have repeatedly found that the future-dangerousness question is not vague and adequately channels a jury's discretion. *See Jurek v. Texas*, 428 U.S. 262, 270-71 (1976); *Trevino v. Thaler*, 449 F. App'x 415, 426-27 (5th Cir. 2011); *Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010); *Scheanette v. Quarterman*, 482 F.3d 815, 827-28 (5th Cir. 2007); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005); *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993). The Fifth Circuit has also regularly found that the mitigation special issue sufficiently defines, and allows the jury to give full consideration to, mitigating evidence. *See Blue v. Thaler*, 665 F.3d 647, 665 (5th Cir. 2011); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007); *Manns v. Quarterman*, 236 F. App'x 908, 911-12 (5th Cir. 2007); *Oliver v. Quarterman*, 254 F. App'x 381, 385–86 (5th Cir. 2007); *Jackson v. Dretke*, 181 F. App'x 400, 413-14 (5th Cir. 2006);

*O'Brien v. Dretke*, 156 F. App'x 724, 735-36 (5th Cir. 2005); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001).[18]

Johnson, however, complains that together the special issues prevent jurors from deciding whether a particular piece of evidence has mitigating or aggravating value. The Supreme Court has recognized that some evidence is a "two-edged sword," because "it may diminish [an inmate's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry I*, 492 U.S. at 324. The fact that certain types of evidence have both aggravating and mitigating features forces defense attorneys to make difficult decisions. Jurors may likewise have difficulty weighing double-edged evidence. However, the Supreme Court has found that

> Texas juries must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed. This process is not an exact science, and the jurors under the Texas bifurcated procedure unavoidably exercise a range of judgment and discretion while remaining true to their instructions and their oaths.

*Adams v. Texas*, 448 U.S. 38, 46-47 (1980) (quotations and citations omitted). However difficult the calculus of sentencing may be, nothing in Supreme Court precedent hints that the special issues unconstitutionally confuse jurors.

The state habeas court considered these three claims together and found that Texas special issue questions passed constitutional scrutiny. State Habeas Record at 293-94. Johnson has not

---

[18]     Johnson argues that the mitigation instruction gives jurors "no real guidance whatsoever of how to interpret" mitigating evidence. Dkt. 1 at 16. Likening Texas' current mitigation special issue to one previously rejected by the Supreme Court, *see Penry v. Lynaugh*, 492 U.S. 302 (1988) ("*Penry I*") and *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"), Johnson argues that the jurors receive mixed signals and are currently unable "to give effect to their decision and a voice to their moral reason." Dkt. 13 at 10. Here, the mitigation instruction that the trial court delivered did not contain the defect identified in *Penry*. In fact, the Supreme Court has described the current mitigation special issue as "[a] clearly drafted catchall instruction on mitigating evidence" remarkable for its "brevity and clarity[.]" *Penry II*, 532 U.S. at 803. Given that endorsement, the Fifth Circuit has found no merit to similar claims. *See Foster*, 369 F. App'x at 606; *Manns*, 236 F. App'x at 911-12; *Oliver*, 254 F. App'x at 385-86.

shown that Texas' capital sentencing scheme unconstitutionally vitiates a capital defendant's punishment-phase evidence.  The state habeas court's rejection of claims C, D, and E was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

**D.      Competency to Waive His Rights (Claim F)**

Johnson argues that he was not competent to waive his constitutional rights during the police interrogations.  Citing trial testimony that Johnson had a low IQ, deficient high-level cognitive functioning, and other mental difficulties, Johnson states that it "seems clear that there is a factual issue as to whether or not [he] has sufficient presence of mind to voluntarily waive his rights under the Fifth and Sixth Amendments when he was questioned."  Dkt. 1 at 17.  Johnson asserts that the Constitution should protect vulnerable individuals – such as those suffering from mental retardation, insanity, or chemical impairment – from circumstances in which they may involuntarily waive their constitutional rights.

As in his federal petition, Johnson asked the state habeas court: "In simple terms, can a mentally impaired or intoxicated person truly ever waive their rights under police custodial questioning?"  State Habeas Record at 13.  The state habeas court replied in a brief conclusion of law:

> While the answer to the question [Johnson] poses in this contention is clearly 'yes,' this Court finds that this claim is without merit because it could have been but was not raised on direct appeal and so may not now be raised in this post-conviction writ. *Ex parte Gardner*, 959 S.W.2d 189 199 (Tex. Crim. App. 1996)[.]

State Habeas Record at 295 (footnote omitted).  Respondent argues that (1) the state decision forecloses federal review under the procedural-default doctrine and (2) the state courts correctly applied constitutional law in denying his claim.

**1.      Procedural Bar**

Under "the doctrine of procedural default . . . a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1316 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). Citing *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996), the state habeas court found that Johnson should have raised this claim on direct appeal. The Court of Criminal Appeals in *Gardner* "found that claims which should have been raised on direct appeal are procedurally defaulted" if first raised in state habeas court. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005). "[T]he *Gardner* rule set forth an adequate state ground capable of barring federal habeas review." *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004); *see also Rachal v. Quarterman*, 265 F. App'x 371, 377 (5th Cir. 2008); *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001); *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000). The state habeas court's ruling forecloses federal review.

Federal law excuses a procedural bar if an inmate "can demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*." *Coleman*, 501 U.S. at 750 (emphasis added). Johnson argues that "cause" exists because his appointed attorney did not raise the barred claim on direct appeal.[19] Ineffective assistance of an appellate attorney may amount to

---

[19]        Johnson also seemingly relies on *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1316 (2012) to provide cause to overcome the procedural bar. Dkt. 13 at 11. *Martinez*, however, is inapplicable in this instance. The *Martinez* Court recently found that deficient performance by a state habeas attorney may amount to cause under some
(continued...)

cause, provided that the inmate meets the deficient performance and prejudice test from *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.");  *Murray v. Carrier*, 477 U.S. 478, 489 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause[.]").

A petitioner must also exhaust his allegations that serve as "cause" for a procedural default.  *See Carpenter*, 529 U.S. at 453 ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted[.]").  Johnson's state habeas application claimed that his attorney should have raised numerous issues on direct appeal, but he focused only on the objections trial counsel had raised in the punishment-charge conference.  Johnson did not fault his appellate attorney for not challenging his mental capacity to waive his rights.  As Johnson has not litigated in state court those arguments he now advances for "cause," they are similarly procedurally barred.[20]

---

[19]     (...continued)
circumstances.  The *Martinez* court held:

>  Where, under state law, claims of ineffective assistance of trial counsel *must be raised in an initial-review collateral proceeding*, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, ___ U.S. at ___, 132 S. Ct. at 1320 (emphasis added); *see also Trevino v. Thaler*, ___ U.S. ___, 133 S. Ct. 1991 (2013).  By way of contrast, the state habeas court found that Johnson should have raised this claim in the first forum it was available, that is, on direct appeal.  *Martinez* does not afford federal review of claim F.

[20]     Even if Johnson had exhausted a challenge to his appellate attorney's representation on that ground, he still must do more than allege attorney ineffectiveness to meet the cause standard.  Johnson does little more than fault appellate counsel for nor raising his now-barred ground for relief.  Such perfunctory argument is insufficient to meet the *Strickland* standard for the purposes of showing cause.  "'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.'"  *Smith v. Murray*, 477 U.S. 527, 535 (1986) (quoting *Carrier*, 477 U.S. at 486-87).  Given the discussion that follows in the text above, Johnson has not shown that appellate counsel ignored a legally or factually strong claim.

2.      Alternative Review of the Merits

The state habeas court noted that this claim lacked both factual and legal support.   Trial testimony from Johnson's experts showed that he had low intelligence, had suffered a traumatic brain injury as a child, developed slowly, and had participated in special education classes.   He also suffered from schizophrenia.   The State, however, challenged the integrity and severity of the evidence presented by the defense.   Even assuming Johnson's evidence to be true, however, does not mean that the police violated his constitutional rights in taking his confession.   The state habeas court correctly observed that the answer to Johnson's question of whether "allegedly mentally impaired person may validly waive their *Miranda* rights – is undoubtedly 'yes.'"   State Habeas Record at 295.   In *Colorado v. Connelly*, the Supreme Court explained that "a defendant's mental condition, by itself and apart from its relation to official coercion" does not determine whether a statement is voluntary.   479 U.S. 157, 164 (1986).   Instead, when looking at the totality of the circumstances, a defendant's mental condition "may be a significant factor in the voluntariness calculus," yet "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional voluntariness."   *Id.* at 164; *see also Sosa v. Dretke*, 133 F. App'x 114, 119 (5th Cir. 2005); *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997); *United States v. Raymer*, 876 F.2d 383, 386-87 (5th Cir. 1989).   The non-retroactivity bar from *Teague v. Lane*, 489 U.S. 288 (1989) prevents this Court from granting habeas relief on Johnson's claim that mental impairment renders a confession *per se* involuntary.

Johnson did not rely on mental-health concerns when he asked the trial court to suppress his confession.[21] Instead, his arguments centered on the invocation of his constitutional rights. Johnson "presented no evidence contending that he involuntarily gave his recorded statements during the motion to suppress hearings or trial." Supplemental Clerk's Record at 5. Johnson, therefore, never developed a state court record showing how mental impairments allegedly rendered his statements involuntary. He has made no effort on federal review to prove that he was incompetent when he waived his constitutional rights. Independent of his *Edwards* claim, Johnson has not shown that the police coerced him into giving a police statement. If procedural law did not prevent federal review of the merits, the Court would deny this claim.

**E.      Racial Concerns in Texas' Implementation of the Death Penalty (Claims G, H, and I)**

Johnson alleges that racial discrimination taints Texas' manner of selecting which defendants to try for capital crimes, which to sentence to death, and which to afford executive clemency. In claim G, Johnson relies on various social-science studies and "a long history of racial discrimination in the application of the death penalty in the United States" to argue that "his chances of receiving the death penalty in the United States, and in particular Harris County, Texas, are far greater simply *because* he is an African-American." Dkt. 1 at 20-21. Claims H and I argue that the Supreme Court's reasoning in *Bush v. Gore*, 531 U.S. 98 (2000), outlaws disparate treatment based on race in capital sentencing and executive clemency.

Johnson does not adduce any direct evidence of racial discrimination. His arguments do not point to any specific decision in his case directly attributable to racial animus. He has not identified

---

[21]      Johnson asks if a "mentally impaired or intoxicated person" can voluntarily waive their constitutional rights. The state habeas court observed that Johnson's "assertion is quizzical given the fact that there is no evidence in this record that he was intoxicated at the time he was asked to waive his constitutional rights to silence and counsel." State Habeas Record at 295, n.2.

any action by the prosecutors, jury, or judge that infused his trial with racial bias.  He does not show any action against him personally by the Texas Board of Pardons and Paroles that would premise executive clemency on racial considerations.  Johnson's arguments instead rely on social science studies, historical trends, and isolated factors to argue that racism permeates Texas' death-penalty process.  Given the lack of specific proof relating to his own case, the state habeas court denied Johnson's claim.

The state habeas court found that "well over two decades ago in *McCleskey* [*v. Kemp*, 481 U.S. 279 (1987)]" the Supreme Court rejected the use of general statistics and studies to show racial discrimination in the death penalty process.  State Habeas Record at 298.  In *McCleskey*, the Supreme Court "acknowledged that a statistical study revealed the possibility that juries in Georgia impermissibly took race into account in making capital sentencing decisions, but declined to hold on the basis of this evidence that the risk was constitutionally unacceptable." *Lincecum v. Collins*, 958 F.2d 1271, 1282 (5th Cir. 1992).  The Constitution's focus is not on generalized arguments, but whether an inmate meets his "burden of proving 'the existence of purposeful discrimination.'" *McCleskey*, 481 U.S. at 293 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).  Simply, "to prevail under the Equal Protection Clause, [Johnson] must prove that the decisionmakers in his case acted with discriminatory purpose.  [Johnson] offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *McCleskey*, 481 U.S. at 292-93.[22]

---

[22]    Legislatures, not courts, "are better qualified to weigh and 'evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.'" *McCleskey*, 481 U.S. at 319 (quoting *Gregg v. Georgia*, 428 U.S. 153, 186 (1976)).

Johnson relies on *Bush v. Gore*, 531 U.S. 98 (2000), to sidestep the requirement that he bring forth affirmative evidence of discrimination. Johnson argues that the Supreme Court's voting-rights decision in *Bush v. Gore* "provides a new means of examining claims of denial of equal protection," particularly with regard to racial issues in the capital-sentencing process. Dkt. 1 at 28. Johnson reads *Bush v. Gore* as removing the requirement that he adduce specific evidence of racism. The Fifth Circuit "previously has discussed *Bush v. Gore's* utter lack of implication in the criminal procedure context." *Chi v. Quarterman*, 223 F. App'x 435, 440 (5th Cir. 2007). On that basis, the Fifth Circuit has repeatedly found that it "is beyond debate" that *Bush v. Gore* does not require federal courts to examine "if the decision to seek the death penalty and the Texas clemency process are unconstitutionally infused with racial considerations[.]" *Coleman v. Quarterman*, 456 F.3d 537 (5th Cir.2006); *see also Chi*, 223 F. App'x at 440; *Wyatt v. Dretke*, 165 F. App'x 335, 339-40 (5th Cir. 2006); *Hughes v. Dretke*, 160 F. App'x 431, 436 (5th Cir. 2006).

Because Johnson has not shown that racism permeated his conviction and sentence, the state habeas court's rejection of these claims was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

**F.     Ineffective Assistance of Appellate Counsel (Claim J)**

In claim J, Johnson asserts that his attorney on direct appeal provided constitutionally ineffective assistance by not championing several objections that trial counsel had made in the punishment phase. Appellate counsel raised five claims before the Court of Criminal Appeals, including challenges to the admission of his police statements. Johnson, however, argues that a reasonably effective attorney would have raised each of the objections preserved by trial counsel.

As outlined by the state habeas court, the trial court denied the following motions during the punishment phase of trial:

1. his request for an "instructed verdict or a charge on the actual mental age of the [Johnson] which was ten, based on the reasoning of *Roper v. Simmons*;

2. his request for an instructed verdict on the issue of future danger;

3. an instruction that society meant prison society under *Berry v. State*;

4. an instruction on residual doubt as [*sic*] mitigation;

5. an instruction for a burden on proof [*sic*] for the State to prove there are no mitigating circumstances;

6. an objection to the instruction that the jury should consider all the evidence that mitigates for or against the death penalty in answering the future danger issue then the party charge issue on [*sic*] 37.071 and then the mitigation special issue;

7. his request that the age [and] mental condition of [Johnson] be considered;

8. his request that the charge include the choice of a "life sentence without parole" as the alternative to the imposition of death;

9. his request to remove the language and phrase of moral blameworthiness from the charge; and

10. an instruction on accomplice witness testimony as it related to the extraneous offenses introduced by the State.

State Habeas Record at 303-04.

"In reviewing a claim alleging ineffective assistance of appellate counsel [courts] apply the traditional *Strickland* standard." *Blanton v. Quarterman*, 543 F.3d 230, 240 (5th Cir. 2008). Using *Strickland* as a guide, an inmate challenging his appellate counsel's selection of claims "must first show that his counsel was objectively unreasonable . . . in failing to find arguable issues to appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief

raising them[.]" *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).  Then, he must also "demonstrat[e]

prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable

failure . . . he would have prevailed on his appeal."  *Id.* at 285-86; *see also Blanton*, 543 F.3d at 240

(describing the prejudice injury as asking if "the outcome of the appeal would have been different").

Appellate counsel responded to Johnson's allegations in an affidavit.  Appellate counsel

explained that he carefully selected those claims he felt had the greatest likelihood of success on

appeal:

> I spent approximately 167 hours reading the 41 volumes of the appellate record
> researching the law and writing the brief.
>
> I did not intend to nor did I write on any and every possible point for review.  It is my
> belief that excessive writing in a brief merely dilutes whatever real strength the brief
> may have.
>
> I selected issues to write on that I thought were points that had the best chance of
> success in assisting applicant on direct appeal.
>
> I did not think that the issues applicant suggested that I should have written on were
> ones that would have resulted in a successful resolution of his appeal and therefore
> I did not write on those issues.

State Habeas Record at 244.

When Johnson raised this claim on habeas review, he outlined the issues he faults appellate

counsel for omitting, but he did not provide extensive briefing of each putative appellate claim's

merits.  The state habeas court provided several reasons for rejecting Johnson's claims.  Taken

together, the state habeas court found that the Court of Criminal Appeals had repeatedly rejected

proposed appellate claims 3, 4, 5, 9, 10.  Also, no controlling authority supported the legal arguments

underlying claims 1, 6, and 8.  Johnson had not adequately briefed claim 7 for judicial consideration.

Appellate counsel's choice not to include claim 2 was "the epitome of reasoned professional

decision." State Habeas Record at 306. The state habeas court lauded appellate counsel's choice of issues to present on appeal, praising "appellate counsels' keen eye in not raising [the] frivolous contention[s]." State Habeas Record at 304-10.

Under the AEDPA, federal habeas courts afford *Strickland* claims a "double deferential" review. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The question is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785 (2011). Here, the state habeas court concluded that Johnson's appellate attorney chose not to raise meritless claims. Johnson argues that "[w]hile reasonable jurors and attorneys may disagree as to the ultimate resolution of these questions, the Appellate counsel's duty was to raise every non-frivolous issue that could save his client's life." Dkt. 1 at 37.

An attorney is not required to raise every potential ground for relief. *See Barnes*, 463 U.S. at 752-53. An appellate attorney cannot be faulted for not raising meritless claims. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). The state habeas court provided valid reasons for which a reasonable attorney would not raise the issues on appeal. Given the repeated rejection of similar issues, the lack of legal support, and the factual weakness of the proposed appellate arguments, Johnson has not shown that appellate counsel ignored meritorious claims, much less that the Court of Criminal Appeals would have decided his appeal otherwise had appellate counsel included them

in his brief.  Accordingly, the state habeas court's rejection of claim J was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

**G.      Changes in State Law (Claim K)**

Claim K argues that a change in state decisional law since Johnson's trial requires federal habeas relief.  According to Johnson, at the time of trial Texas law had not clarified whether an inmate could present evidence of mental impairment to counteract the State's assertion that he had the *mens rea* for a particular crime.  After Johnson's trial the Court of Criminal Appeals decided *Ruffin v. State*, 270 S.W. 3d 592 (Tex. Crim. App. 2008), a case which Johnson characterizes as holding that a criminal defendant could present such evidence in the guilt/innocence phase.  Here, Johnson wishes that the jury had been able to consider whether organic brain trauma or mental illness diminished his capacity to kill knowingly.  Johnson contends that the change in state law amounts to a Sixth and Eighth Amendment violation, requiring his retrial with evidence admitted in accordance with *Ruffin*.

While Johnson casts his claim in the context of the federal constitution, his complaint is actually the application of state law.  A federal habeas court does not sit as a super-state appellate court.  *See, e.g., Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986) (observing that "federal courts do not sit as courts of appeal and error for state court convictions").  Federal habeas review asks "whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States,'" not the laws of a State.  *Coleman*, 501 U.S. at 730.  The admissibility of evidence relating to a criminal defendant's mental state is a purely state-law concern.  A federal habeas court cannot "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)("[F]ederal habeas corpus relief

does not lie for errors of state law"). Johnson's claim relating to the *Ruffin* decision does not provide a cognizable basis for federal habeas corpus relief.

Even so, the state habeas court found that Johnson overstated the effect of *Ruffin* on Texas law. "Contrary to [Johnson's] claim the holding in *Ruffin* broke no new jurisprudential ground." State Habeas Record at 310. According to the state habeas court, the Court of Criminal Appeals had previously "held that both lay and expert testimony of a mental disease or defect that directly rebuts the particular mens rea for the charged offense is relevant and admissible unless excluded under a specific evidentiary rule." State Habeas Record at 310-11 (citing *Jackson v. State*, 160 S.W.3d 568, 573-74 (Tex. Crim. App. 2005)). Because Texas law at the time of trial already allowed the admission of such evidence, "nothing would have precluded [Johnson] from introducing the very extensive evidence of impairment as it affected the culpable mens rea that he now claims he should be permitted to elicit on remand in light of *Ruffin*." State Habeas Record at 311. Simply, "*Ruffin* was no watershed decision[.]" State Habeas Record at 311.

Texas' interpretation of its own law restricts this Court's adjudication of claim K. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). Johnson has not raised a cognizable federal claim and has otherwise not shown an entitlement to relief. The Court will deny claim K.

## V. Conclusion

As discussed above the Court **DENIES** Johnson's Motion to Abate or Amend.  The Court also **DENIES** Johnson's federal petition for a writ of habeas corpus on all but his first ground for relief.  The Court **ORDERS** the parties to provide additional briefing regarding Johnson's *Edwards* claim.  Respondent will provide a brief on the issue within thirty (30) days from the entry of this Order.  The petitioner will reply within thirty (30) days thereafter.

Signed at Houston, Texas on August 19, 2013.

Gray H. Miller
United States District Judge