IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | | |
|---|---|---|
| **DEXTER DARNELL JOHNSON**, | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-cv-2466 |
| | § | |
| **LORIE DAVIS**, Director, | § | **DEATH PENALTY CASE** |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| *Respondent*. | § | |

**OPPOSED MOTION TO TERMINATE PATRICK F. MCCANN'S
APPOINTMENT**

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (24084578)
Supervisor, Capital Habeas Unit
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

# TABLE OF CONTENTS

Table of Contents ............................................................................. i

Table of Authorities ...................................................................... iii

I.    Factual background. ............................................................... 2

II.   Mr. McCann's failure to fulfill basic responsibilities to Mr. Johnson
      constitutes ineffective assistance of counsel. ................................ 7

      A.   Mr. McCann failed to collect Mr. Johnson's case file. ............ 9

      B.   Mr. McCann violated his professional and ethical duties to Mr.
           Johnson by defending his state habeas representation while nominally
           seeking excusal from procedural default under *Martinez v. Ryan.* ..... 11

      C.   Mr. McCann failed to inform Mr. Johnson of his conflict of interest
           under *Martinez v. Ryan.* ....................................... 14

      D.   Mr. McCann failed to timely present claims for relief in accordance
           with state law. .................................................. 15

III.  Several unpresented, potentially meritorious, claims for relief exist that
      Mr. McCann has failed to raise. ............................................. 18

      A.   Mr. Johnson likely qualifies for a diagnosis of intellectual disability.  18

      B.   Trial counsel were ineffective for failing to preserve error when the
           State misstated the law during punishment phase closing arguments
           and claimed that mitigating evidence must be connected to the crime.
           ..................................................................... 22

      C.   A State witness presented false testimony that Mr. Johnson was
           eligible for a less-restrictive custody classification, and trial counsel
           were ineffective for eliciting that testimony. ..................... 24

      D.   Significant unpresented issues remain regarding Mr. Johnson's
           conviction. ........................................................ 25

      E.   Trial counsel were ineffective for failing to investigate and present
           evidence that Mr. Johnson lacked the requisite intent to commit
           capital murder. .................................................... 26

      F.   Mr. Johnson's trial counsel worked for the Harris County District
           Attorney's Office without appropriate protective measures in place... 26

      G.   New discovery from the State could lead to relief. ............... 28

IV.   Viable vehicles exist in both state and federal court to litigate the
      unpresented claims. ......................................................... 28

A.   State court vehicles. ............................................................... 29

B.   Federal court vehicles. ........................................................... 32

V.   The present representation arrangement, under which two legal teams are tasked with independently pursuing investigations and litigation in anticipation of his May 2, 2019 execution date, risks fatal prejudice to Mr. Johnson. .................................................................................. 33

VI.   The FPD is best situated to represent Mr. Johnson in the investigation and pursuit of his unpresented claims. ......................................... 36

A.   Mr. McCann's abysmal performance in representing Mr. Johnson to date should leave this Court with no confidence in his ability to capably represent him going forward. .................................. 36

B.   Arguments that must be made to render Mr. Johnson's claims procedurally viable cannot be made by Mr. McCann. .......................... 37

C.   The FPD is equipped and able to represent Mr. Johnson in both state and federal court. .................................................................. 38

VII.  Conclusion and prayer for relief. .................................................. 38

Certificate of Conference .................................................................... 40

Certificate of Service.......................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ex parte Alvarez,*
2015 WL 1956254 (Tex. Crim. App. 2015) ........................................................... 30

*Atkins v. Virginia,*
536 U.S. 304, 307 (2002) ...................................................................................... 19

*Ayestas v. Stephens,*
817 F.3d 888 (5th Cir. 2016) ................................................................................. 6

*Battaglia v. Stephens,*
2013 WL 5570216 (N.D. Tex. 2013) ...................................................................... 33

*Brady v. Maryland,*
373 U.S. 83 (1963) ......................................................................................... 25, 28

*Ex parte Buck,*
418 S.W.3d 98 (Tex. Crim. App. 2013)................................................................. 30

*Ex parte Chabot,*
300 S.W.3d 768 (Tex. Crim. App. Dec. 9, 2009) .................................................. 35

*Christeson v. Roper,*
135 S. Ct. 891 (2015) .................................................................................... 15, 37

*Colorado v. Connelly,*
479 U.S. 157 (1986) ................................................................................................ 4

*Davila v. Davis,*
137 S. Ct. 2058 (2017) .......................................................................................... 30

*Eddings v. Oklahoma,*
455 U.S. 104 (1982) .............................................................................................. 22

*Estrada v. State,*
313 S.W.3d 274 (2010)........................................................................................... 24

*Ex parte Guevara,*
2018 WL 2717041 (Tex. Crim. App. June 6, 2018) .............................................. 20

*Hall v. Florida,*
134 S. Ct. 1986 (2014) .................................................................................... 19, 20

*Johnson v. Stephens,*
  No. 14-70024, Slip Op. (Jul. 2, 2015) ..................................................... 6

*Johnson v. Stephens,*
  No. 4:11-cv-02466, DE 1 (S.D. Tex. Jun. 28, 2011) ............................... 3

*Johnson v. Thaler,*
  No. 4:10-mc-00318, DE 1 (S.D. Tex. Jul. 29, 2010) ............................... 3

*Ex parte Johnson,*
  No. WR-73,600-01, Slip Op. (Tex. Crim. App. Jun. 30, 2010) ................ 3

*Lee v. Alabama,*
  406 F.2d 466 (5th Cir. 1968) .................................................................. 33

*Lockett v. Ohio,*
  438 U.S. 586 (1978) ............................................................................... 22

*Ex parte Long,*
  2018 WL 3217506 (Tex. Crim. App. June 27, 2018) ............................ 20

*Maples v. Thomas,*
  566 U.S. 266 (2012) ............................................................................... 31

*Martinez v. Ryan,*
  566 U.S. 1 (2012) ..................3, 5, 6, 7, 8, 11, 13, 14, 15, 29, 31, 32, 33, 34, 35, 37

*Ex parte McCarthy,*
  2013 WL 3283148 (Tex. Crim. App. 2013) ........................................... 30

*McFarland v. Scott,*
  512 U.S. 849 (1994) ............................................................................... 37

*Mendoza v. Stephens,*
  783 F.3d 203 (5th Cir. 2015) ................................................................. 13

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ............................................................................ 4, 6

*Moore v. Texas,*
  137 S. Ct. 1039 (2017) ..................................................................... 19, 20

*Napue v. Illinois,*
  360 U.S. 264 (1959) ............................................................................... 25

*In re Paredes,*
  587 Fed. App'x. 805 (5th Cir. 2014) ...................................................... 33

*Penry v. Johnson,*
    532 U.S. 782 (2001) ............................................................................... 22

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) ........................................................................ 22, 23

*Rudd v. State,*
    616 S.W.2d 623 (Tex. Crim. App. 1981) ............................................. 33

*Schneckloth v. Bustamonte,*
    412 U.S. 218 (1973) ............................................................................... 4

*Smith v. Texas,*
    543 U.S. 37 (2004) ............................................................................... 22

*Speer v. Stephens,*
    781 F.3d 784 (5th Cir. 2015) .............................................................. 13

*Strickland v. Washington,*
    466 U.S. 688 (1984) ............................................................................ 25

*Trevino v. Thaler,*
    569 U.S. 413 ................................................................................... 32, 34

*Wilkins v. Davis,*
    832 F.3d 547 (5th Cir. 2016) .............................................................. 38

*Ex parte Williams,*
    2018 WL 2717039 (Tex. Crim. App. June 5, 2018) ............................. 20

**Rules and Other Authorities**

18 U.S.C. § 3599 ........................................................................... 3, 14, 37

18 U.S.C. § 3599(e) ............................................................................... 38

18 U.S.C. § 3599(f) ................................................................................. 3

28 U.S.C. § 2244 ................................................................................... 32

28 U.S.C. § 2254 ................................................................................... 32

28 U.S.C. § 2254(d) ................................................................................ 5

Tex. Code Crim. Proc. art. 11.071 § 5(a) ........................... 20, 29, 30, 31, 32

Tex. Code Crim. Proc. art. 11.071 § 5(f) ...................................... 17, 20

v

Tex. Code Crim. Proc. art 11.071 § 6(b-1) .................................................... 38

**Other Authorities**

American Association on Intellectual and Developmental Disabilities,
    *Intellectual Disability: Definition, Classification, and Systems of*
    *Supports* (11th ed.) ................................................................................ 19

American Bar Association ........................................................................... 9

American Psychiatric Association's *Diagnostic and Statistical Manual of*
    *Mental Disorders* ("DSM-5") .................................................................. 19

National Legal Aid and Defender Association, *Standards for the*
    *Appointment and Performance of Counsel in Death Penalty Cases* (1988) ........... 9

Tex. R. App. P. 33.1 ........................................................................... 23, 24

Texas Bar Journal Vol. 69, No. 10 .................................................... 4, 9, 17

Texas Disciplinary Rules of Professional Condcut, Rule 1.06 .................... 14

*Guidelines and Standards for Texas Capital Counsel* (2006) ............ 4, 9, 17

U.S. Const. amend. VI .............................................................................. 6

U.S. Const. amend. VIII. ......................................................... 4, 6, 19, 20, 22

## OPPOSED MOTION TO TERMINATE PATRICK F. MCCANN'S APPOINTMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Petitioner, DEXTER DARNELL JOHNSON, by and through undersigned counsel, the Office of the Federal Public Defender for the Northern District of Texas ("FPD"), and moves for the termination of Patrick F. McCann as court-appointed counsel. In response to this Court's appointment order, the FPD has rapidly reviewed and assessed Mr. Johnson's case. That review casts serious doubt on the constitutionality of Mr. Johnson's conviction and sentence of death. It leaves no doubt, however, that Mr. McCann has provided Mr. Johnson ineffective assistance of counsel.

Mr. McCann's performance in this case falls far below prevailing professional norms. He failed to conduct perhaps the most basic duty of post-conviction counsel in a capital case—collecting the trial teams file. In the ten-plus years that he represented Mr. Johnson, he did not collect voluminous files from either of Mr. Johnson's trial counsel or from the trial mitigation specialist. This task is elementary; yet, it is essential to providing competent representation in habeas corpus proceedings. Furthermore, Mr. McCann failed to raise numerous potentially meritorious claims, all of which have viable remaining vehicles to present them in both state and federal court. These claims, chronicled in Section III, *infra*, include easily-identifiable issues of ineffective assistance of trial counsel, false testimony, and categorical ineligibility for the death penalty. The failure to identify and litigate these issues previously is inexcusable.

1

Troublingly, in previous federal court litigation, Mr. McCann actively litigated in a way that was *against* Mr. Johnson's interests, which created a clear conflict between Mr. McCann and Mr. Johnson—and one that was never conveyed to Mr. Johnson. Allowing Mr. McCann to remain as Mr. Johnson's attorney will prevent Mr. Johnson from pursuing numerous potential meritorious avenues for relief, as these claims will once again require Mr. Johnson to assert that Mr. McCann was ineffective—which Mr. McCann, of course, cannot do without further cementing the unmistakable conflict of interest.

In sum, based on Mr. McCann's unprofessional errors and omissions, his ability to represent Mr. Johnson leading up to his May 2, 2019 execution date is incurably impaired. For these reason, Mr. Johnson requests that Mr. McCann's appointment be terminated.[1] Mr. Johnson will, in short order, file a motion for stay of execution in conjunction with the instant request.

## I.    Factual background.

Mr. Johnson was convicted of capital murder and sentenced to death on June 28, 2007. On the same day, Mr. McCann was appointed to represent Mr. Johnson in state habeas proceedings. 3 CR 681 (*Texas v. Johnson*, No. 1085483, 11.071 Writ of Habeas Corpus Oath of Indigence/Findings of Fact/Order Appointing Counsel/Statement of Facts (208th D.Ct. Jun. 28, 2007)). Mr. McCann timely filed an initial state habeas application on July 23, 2009, raising eleven grounds for relief, but presenting no new, case-specific evidence. The trial court found there were no

---

[1] The FPD has consulted with Mr. Johnson regarding this motion. It has his full support.

previously unresolved, controverted fact questions raised by the application and, without holding an evidentiary hearing, entered findings of fact and conclusions of law recommending the denial of relief. The Texas Court of Criminal Appeals denied habeas relief on June 30, 2010. *Ex parte Johnson*, No. WR-73,600-01, Slip Op. (Tex. Crim. App. Jun. 30, 2010) (per curiam).

Mr. McCann moved for appointment to continue representing Mr. Johnson in federal habeas pursuant to 18 U.S.C. § 3599, stating he was "best qualified and suited to represent Mr. Johnson on his federal pleadings." *Johnson v. Thaler*, No. 4:10-mc-00318, DE 1 at 1 (S.D. Tex. Jul. 29, 2010). He was appointed the next day. *Id*. DE 2. Thereafter, Mr. McCann did not seek ancillary services pursuant to 18 U.S.C. § 3599(f) to investigate the federal habeas petition.

On June 6, 2011, the Supreme Court granted certiorari in *Martinez v. Ryan*, 566 U.S. 1 (2012), to decide whether a Sixth Amendment right to effective assistance of initial-review post-conviction counsel existed. Three weeks later, on June 28, 2011, Mr. McCann filed a habeas petition in this Court, *Johnson v. Stephens*, No. 4:11-cv-02466, DE 1 (S.D. Tex. Jun. 28, 2011).[2] The petition raised no new grounds for relief and was copied nearly verbatim from the state habeas application and brief on appeal. Mr. McCann did not raise an ineffective assistance of trial counsel claim in state or federal court in his initial filings. *Id*. The petition re-raised ten claims from the state habeas application and one claim from the direct appeal brief.[3] The state

---

[2] Hereafter, references to filings in cause 4:11-cv-02466 before this Court will cite only the docket entry number.

[3] The single state habeas claim that Mr. McCann did not re-raise in federal court was claim "F. The Applicant's Confession was Taken After he had Asked for an Attorney and Thus its Admission Violated

habeas claims were copied verbatim into the federal petition, with the single exception that references to Mr. Johnson were changed from "applicant" to "petitioner." The petition did not contain a statement of facts, a procedural history, or any writing that was not contained in the state papers.

No new evidence was presented in support of the claims in the federal petition and the legal arguments were not updated with relevant intervening case law. The arguments did not follow rationally from the evidence or the case law, they were often internally inconsistent within a given claim, and the entire petition was riddled with grammatical errors—to the extent that numerous "sentences" were not even complete sentences, and many more were written in a manner wholly inappropriate for a federal pleading. Mr. McCann even posed rhetorical questions throughout the petition, at least one of which has a well-established answer in the case law that is at odds with the argument he was attempting to make.[4] In short, there was no chance

---

the Prohibitions Laid out Under the Fifth and Sixth Amendments in *Miranda v. Arizona*, 384 U.S. 436 (1966)." This claim was a copy of the direct appeal claim that he inserted into the federal petition. Because Claim F was an entirely record-based claim, it was non-cognizable in state habeas. *See* State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006), reprinted in Texas Bar Journal Vol. 69, No. 10, Guideline 12.2(B)(1)(a) ("Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.").

[4] Mr. McCann asked, "[i]n simple terms, can a mentally impaired or intoxicated person truly ever waive their rights under police custodial questioning?" DE 1 at 17. The legal answer to that question is "yes." The Supreme Court has clearly established that whether a *Miranda* waiver is voluntary is a question of fact, and that factors such as mental impairment and intoxication are only a part of the voluntariness analysis. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973) (courts must consider "all the surrounding circumstances" in determining the voluntariness of a *Miranda* waiver, and the accused's state of mind at the time of the waiver is not in and of itself determinative); *see also Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The voluntariness of a waiver[] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word.") (citations omitted).

that the state habeas claims would result in federal habeas relief for Mr. Johnson, nor did Mr. McCann advance any argument at any point that the bars to relitigation of those claims—28 U.S.C. §§ 2254(d) and (e)—were satisfied.

The Director answered the petition on February 23, 2012. On March 20, 2012, the Supreme Court decided *Martinez*. In *Martinez*, the Court did not recognize a Sixth Amendment right to effective post-conviction counsel, but it created, for the first time, an opportunity for some prisoners to establish cause and prejudice for procedurally defaulted IATC claims based on deficient representation by state habeas counsel. 566 U.S. at 9. Mr. Johnson filed a reply on July 20, 2012. The only mention of the landmark decision in the reply brief was an attempt by Mr. McCann to rely on *Martinez* to excuse the procedural default of a non-Sixth Amendment claim that was procedurally barred in state habeas because the claim was, in fact, an appellate issue and not cognizable on collateral review. DE 13 at 11-12. The argument demonstrates a misunderstanding of *Martinez*'s holding.

On December 28, 2012, Mr. McCann unsuccessfully sought to abate the proceeding or amend the petition to allege—for the first time—a claim that trial counsel was ineffective for failing to present mental health evidence to rebut Mr. Johnson's intent at the merits phase. DE 14. Mr. McCann included language about *Martinez* as justification for the request. This required Mr. McCann to assert that he was ineffective during the state habeas process to succeed, but rather than doing so, he advanced various arguments for why he was not at fault. This Court denied the motion to abate or amend, finding counsel's litigation tactics were abusive and that

5

the delay in raising the IATC claim was not justified. DE 19. The Court thereafter denied all grounds for relief, but granted a certificate of appealability ("COA") on a claim—preserved by direct appeal counsel—that the State had violated *Edwards v. Arizona*, 384 U.S. 436, 474 (1966), by continuing to interrogate Mr. Johnson after he had asserted his right to an attorney. DE 19, 31.

Mr. Johnson appealed the denial of his *Edwards* claim and sought a COA to appeal the denial of his claims that the Eighth Amendment should forbid the execution of severely mentally ill persons; that Mr. Johnson was not mentally competent to waive his rights during custodial interrogation; and that a change in Texas evidentiary law should require a retrial of Mr. Johnson's guilt. He also sought a COA to appeal the denial of his motion to abate or amend his federal petition in light of *Martinez*.[5] The Fifth Circuit denied the requested COA and affirmed the district court's denial of the *Edwards* claim. *Johnson v. Stephens*, No. 14-70024, Slip Op. (Jul. 2, 2015).

On January 15, 2019, Mr. Johnson wrote a letter to this Court. He explained that he was told by other inmates that Mr. McCann had a conflict of interest in representing him; that Mr. McCann had not explained to him what was going on in his case; and, that he was requesting new counsel. DE 65. In response to this letter, Mr. McCann filed a sealed, unopposed response opposing Mr. Johnson's request. DE 66. On January 29, 2018, Mr. Johnson filed a motion for appointment of counsel. DE

---

[5] A COA is not required to appeal the district court's procedural rulings, and this issue should have been presented as an appeal. *See Ayestas v. Stephens*, 817 F.3d 888, 895 (5th Cir. 2016) ("a COA is only required of appeals of 'final orders that dispose of the merits of a habeas proceeding'") (*quoting Harbison v. Bell*, 556 U.S. 180, 183 (2009)).

68. On February 5, 2019, in response to a motion filed by Mr. Johnson, the Court appointed the FPD as co-counsel. DE 70 at 2. In the order appointing the FPD to represent Mr. Johnson, the Court decided to maintain Mr. McCann's appointment as lead counsel, citing the several years and phases of litigation during which McCann has already represented Mr. Johnson and his experience with the case. DE 70 at 2. The Court also cited the fact that McCann raised *Martinez*-related issues in the first round of federal habeas proceedings. *Id*. That order instructed the FPD to: (1) make a thorough and independent assessment of whether unpresented claims remain; (2) "explore whether Johnson can establish cause for the procedural default of any ineffective-assistance-of-trial-counsel claims pursuant to *Martinez*"; (3) assess "whether those claims merit relief"; and assess (4) "whether a viable vehicle exists for raising those claims in federal court." *Id*.

## II.   Mr. McCann's failure to fulfill basic responsibilities to Mr. Johnson constitutes ineffective assistance of counsel.

Whether Mr. Johnson can establish cause to excuse the procedural default of underlying ineffective assistance claims turns on whether Mr. McCann provided effective assistance in state habeas.[6] The FPD's review establishes that he has not.

After gathering Mr. Johnson's case file, conducting substantial record review, and initiating investigations, the FPD has concluded that numerous, unpresented and potentially meritorious claims exist, and that Mr. McCann's appointment is no longer justified. The FPD discovered that Mr. McCann has not fulfilled even the most

---

[6] The FPD recognizes that establishing cause under *Martinez* also requires a showing that the underlying claim is substantial, meaning that is has "some merit." 566 U.S. at 14. However, because that questions parallels Section III, *infra*, those arguments are not repeated here.

rudimentary duties of state habeas or CJA counsel, such as maintaining a complete case file or conducting a reasonable investigation; despite being the only post-conviction attorney ever given the mandate to conduct an extra-record investigation on Mr. Johnson's behalf, Mr. McCann has not raised a single new, case-specific fact in state or federal habeas. Thus, his "experience" with the case appears superficial, at best. Instead, his pleadings merely repackage the state of the record as it was presented at trial.

Moreover, Mr. McCann having raised *Martinez* issues previously is problematic for his continued representation, rather than evidence of his superior placement to represent Mr. Johnson. Mr. McCann has a direct conflict of interest with Mr. Johnson relevant to *Martinez*-related arguments. By failing to identify and inform the Court of that conflict, and by using Mr. Johnson's *Martinez*-related pleadings to defend his own work rather than promote his client's interests, Mr. McCann has only further entrenched the conflict and prejudiced his client. The conflict between Mr. McCann and Mr. Johnson continues today because, to render any of the claims Mr. McCann has not raised procedurally viable in state or federal court at this stage of his proceedings, Mr. Johnson must make arguments that focus substantially on his failure to raise potentially meritorious claims in initial state and federal collateral review. Maintaining Mr. McCann's appointment will fatally prejudice Mr. Johnson.

### A.      Mr. McCann failed to collect Mr. Johnson's case file.

A basic duty of post-conviction counsel is collecting the client's entire case file, which requires reaching out to the client's prior attorneys, investigators, and experts who have worked on the case over the years. The duty of post-conviction counsel to collect the client's entire case file is well-established.  State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006), reprinted in Texas Bar Journal Vol. 69, No. 10, Guideline 11.1.B ("Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes *at a minimum* interviewing prior counsel and members of the defense team and examining the files of prior counsel."); American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003), reprinted in 31 Hoftstra L. Rev. 913, Guideline 10.7.B.1 (same); National Legal Aid and Defender Association, *Standards for the Appointment and Performance of Counsel in Death Penalty Cases* (1988), Standard 11.9.3(b) ("With the consent of the client, postconviction counsel should obtain and review all prior counsels' file(s)."). Yet, Mr. McCann failed to perform this basic function, an inexcusable omission. While few errors constitute *per se* ineffective assistance of counsel, Mr. McCann's failure to collect Mr. Johnson's case file should qualify as such.

After appointment, the FPD began reaching out to various prior attorneys and critical trial team members. A troubling fact pattern emerged—that Mr. McCann had either never, or only recently, requested files from them. Anthony Osso, Mr. Johnson's second chair counsel from trial, was contacted less than a week after the appointment of the FPD. At that time, Mr. Osso informed the FPD that *Mr. McCann had first*

*requested his files only the previous week—the same week that the FPD was appointed.* It is unlikely to be coincidental that, in the same time frame that this Court appointed co-counsel to assess whether Mr. McCann had provided ineffective assistance, he reached out to Mr. Osso to at last collect these files. Mr. Osso's files contain a substantial amount of material that is critical to the development of potential habeas corpus claims. There is no viable excuse for why Mr. McCann was unable to complete this basic task in the previous ten-plus years that he represented Mr. Johnson.

Similarly, Mr. McCann failed to collect files from lead trial counsel Jim Leitner. The materials from Mr. Leitner, which the FPD received, amount to four full bankers boxes of various materials. Additionally, the trial team's mitigation investigator, Danalynn Recer, had a large quantity of boxes containing various records, and additional materials in electronic format. None of these files were collected by Mr. McCann.

In sum, the files Mr. McCann neglected to collect and review are a substantial quantity of both paper and electronic files. These files contain critical information relevant to possible claims for relief for Mr. Johnson. Mr. McCann's failure to complete this basic task unmistakably supports that his performance in representing Mr. Johnson was far below prevailing professional norms for capital post-conviction counsel.

**B.      Mr. McCann violated his professional and ethical duties to Mr. Johnson by defending his state habeas representation while nominally seeking excusal from procedural default under *Martinez v. Ryan.***

On June 28, 2011, Mr. McCann filed an initial federal habeas petition. DE 1. The petition re-raised claims and allegations that had been presented in state court. It did not allege any claims that were not presented in state court, and no pre-petition requests were made for auxiliary services to pursue new lines of investigation.

On December 28, 2012, nine months after *Martinez* was announced, Mr. McCann filed a motion seeking to stay the federal proceeding, arguing that "[r]ecent developments in the law have caused habeas counsel to re-evaluate not only the facts of this case but also his sworn duty to the client." DE 14 at 1. The motion exposed the fact that McCann had realized, after filing the initial state habeas application, that he *should have raised, but did not raise,* allegations that trial counsel failed to present evidence of Mr. Johnson's "psychological and biological mental impairment" during the merits phase of trial to demonstrate an absence of the requisite intent to commit capital murder. *Id*. at 2-3. Although the arguments in the motion are convoluted, they clearly undermined Mr. Johnson's possibility of securing relief from default under *Martinez*: "In this motion, the Petitioner will also address the interplay of the timelines under Texas' Article 11.071 as regards state habeas counsel's initial decision to pursue these claims *as structural matters rather than as deprivation of effective counsel*." *Id*. at 3 (emphasis added).

Mr. McCann attributed his failure to raise the IATC claim in state habeas to Mr. Johnson's trial and direct appeal representatives, to the Texas Rules of Criminal

Procedure, and to the trial court, all of which, he argued, worked together to "foreclose" his ability to timely present the record-based IATC claim in the initial state habeas application:

> In this case the appellate lawyer failed to raise these matters regarding capacity and ineffective assistance [presumably IATC for failure to present evidence contesting Mr. Johnson's intent] via motion for new trial. The trial attorney did not present these matters at guilt innocence phase. Thus these matters, unless raised by habeas counsel now, are forever waived for the client.

> Given the changes in this area of law, and what appears to be a substantive sea change in the nature of post conviction representation, the appointed writ counsel now believes he was remiss in failing to submit ineffective assistance of counsel challenges to both the trial attorney and direct appeal attorney. Based on the procedural time constraints set forth in Article 11.071, Texas Code of Criminal Procedure counsel neither had the time nor resources to develop and present the claim(s) or develop the evidence of Petitioner's psychological and biological impairments, thus foreclosing any effort of undersigned counsel by procedural bar as argued by the state's attorney and adopted by the state habeas court. Habeas counsel sought both discovery and evidentiary hearing in state court and was denied by the court. Then the state habeas court penalized Petitioner for not raising the claim. Thus this no longer appears to be a matter of deciding as a tactical matter which claims can best be fitted into procedural hurdles, but rather is more in the nature of ensuring that all possible valid grounds are properly presented and exhausted on behalf of the client, despite the procedural hurdles thrown up under 11.071 and the trial court's denial of discovery.

*Id*. at 8-9.

To summarize, sometime before the CCA denied Mr. Johnson habeas relief, Mr. McCann identified a record-based claim that *he should have raised in the initial state habeas application*. *See* Section II(D), *infra*. After neglecting to include the claim in the state habeas application, he then failed to raise the claim in the federal habeas

12

petition and sought no auxiliary services from the federal court to assist him in investigating and developing the claim. Only after *Martinez* was announced did Mr. McCann seek leave to amend the claim into the federal habeas petition and/or return to state court to seek merits review. But he also argued in that motion that he had not been ineffective in state habeas, a required showing to obtain relief from procedural default under *Martinez*.[7]

At the time Martinez was decided, several state habeas counsel were representing their clients in federal habeas. To the best of the FPD's knowledge, Mr. McCann is the *only* attorney that identified a claim that he had defaulted in state habeas, nominally argued that the claim should be considered under *Martinez*, and then provided the Court with numerous excuses for his failure to raise the claim in state habeas, in contravention of his client's interests. And just two months ago, Mr. McCann filed a document in this Court arguing against his client's request for conflict-free counsel to investigate, *inter alia*, the effectiveness of his state habeas representation.

The Fifth Circuit began appointing conflict-free counsel to petitioners in Mr. Johnson's position in 2015, specifically instructing conflict-free counsel to conduct investigations into defaulted ineffectiveness claims. *Mendoza v. Stephens*, 783 F.3d 203 (5th Cir. 2015); *Speer v. Stephens*, 781 F.3d 784 (5th Cir. 2015). The fact that Mr. McCann refused to request the same relief for Mr. Johnson, and went so far as to identify a defaulted ineffectiveness claim and then defend his state habeas

---

[7] Mr. McCann also sought to amend the petition to include a claim that direct appeal counsel was ineffective for failing to raise the IATC claim in a motion for new trial.

representation on the record, without a single officer of the courts raising a flag or instructing Mr. Johnson of his rights, was a plain violation of 18 U.S.C. § 3599.

### C. Mr. McCann failed to inform Mr. Johnson of his conflict of interest under *Martinez v. Ryan*.

Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct states in relevant part:

> (b) . . . [E]xcept to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:
>
>> (2) reasonably appears to be or become adversely limited . . . by the lawyer's or law firm's own interests.
>
> (c) A lawyer may represent a client in the circumstances described in (b) if:
>
>> (1) the lawyer reasonably believes the representation of each client will not be materially affected; and
>>
>> (2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

Comment 4 to Rule 1.06 states,

> The critical questions are the likelihood that a conflict exists or will eventuate and, if it does, whether it will materially and adversely affect the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. *It is for the client to decide whether the client wishes to accommodate the other interest involved.*

(Emphasis added). And Comment 5 specifically notes that "[i]f the probity of the lawyer's own conduct in a transaction is in question, it may be difficult for the lawyer to give a client detached advice."

These rules were in existence at the time *Martinez* was decided. Mr. McCann had a duty, at that time, to inform Mr. Johnson of the conflict that had arisen, recommend that Mr. Johnson consult with independent legal counsel to assist him in deciding whether to waive the conflict, and request independent counsel from this Court. Based on the letters filed by Mr. Johnson, it is clear that he did not inform Mr. Johnson of the conflict at that time. DE 65, 68. Mr. Johnson did not learn of his lawyer's conflict until years later, when another prisoner explained it to him.

Mr. McCann should have been aware of this issue. At the latest, by the time Mr. McCann attempted to raise a claim under *Martinez*, or by the time the Supreme Court decided *Christeson v. Roper*, 135 S. Ct. 891, 894 (2015), or after numerous Fifth Circuit and district court orders appointing conflict-free counsel under *Martinez*, he was on notice that he had a duty to confer with his client and the courts.

### D.  Mr. McCann failed to timely present claims for relief in accordance with state law.

Mr. McCann's unsuccessful attempt to abate the proceeding or amend the petition to allege—for the first time—a claim that trial counsel was ineffective for failing to present mental health evidence to rebut Mr. Johnson's intent at the merits phase was filed years too late. In the motion, Mr. McCann relied on *Martinez*, but he simultaneously argued that his state habeas representation was not ineffective, in direct contravention of Mr. Johnson's interests. Not only did the motion demonstrate that a conflict of interest had arisen between Messrs. McCann and Johnson, but McCann made arguments about the Texas state post-conviction process that plainly

showed his unfamiliarity with the well-established rules contained in Texas Rules of Criminal Procedure Article 11.071.

The motion claimed that McCann moved for discovery to develop the defaulted IATC claim at a state habeas hearing after the initial state habeas application was filed, which was denied. DE 14 at 2. McCann's subsequent attempt to amend the application was denied. *Id*. at 2-3. The motion concludes, "[s]o, first, an opportunity to pursue these matters was denied by the state trial court, acting as an investigative arm of the Court of Criminal Appeals." *Id*. at 3. The error in state habeas was, therefore, a "structural matter[]" rather than ineffective assistance by McCann. *Id*.

As a principal matter, McCann promised to attach the transcript from the state habeas hearing referenced in both the reply brief and the motion to abate or amend, but never did attach the transcripts. DE 13, 15. The state habeas court did not hold an evidentiary hearing on the initial state habeas application, nor does the docket show that any other hearing was held. Regardless, the IATC claim that McCann attempted to raise in federal court relied entirely on the penalty-phase evidence from trial and did not attempt to introduce new evidence. The claim argued that trial counsel should have pursued a litigation strategy that front-loaded the mitigation evidence to the merits-phase of trial, not that trial counsel failed to undertake an adequate investigation. Therefore, no discovery or investigations were necessary to substantiate the allegation, at least at the pleading stage.

Mr. McCann additionally complained that Texas procedural rules effectively prohibited him from adequately representing his client in state habeas because they

disallow post-application investigations, discovery and amendment. DE 15 at 2-3, 10. This is simply not true, as the claim could have, and should have, been pled in the initial state habeas application. This particular IATC claim required no investigations or discovery to plead. Moreover, Texas Rules of Criminal Procedure Article 11.071, Section 3(a) states, "[u]pon appointment, counsel shall investigate expeditiously . . . the factual and legal grounds for the filing of an application for a writ of habeas corpus." The Rules also clearly state that an amended or supplemental application that is not filed by the deadline for the initial application shall be treated as a subsequent application and will be subject to the successive petition requirements. Tex. Code Crim. Pro. art. 11.071 § 5(f). These rules were in place at the time Mr. McCann was appointed to represent Mr. Johnson, and he was on notice of his professional obligations. There is simply no excuse for not raising a claim that was based entirely on the record on appeal in the initial application:

> Habeas corpus counsel should assume that any meritorious issue not contained in the *first* state application for writ of habeas corpus will be waived or procedurally defaulted in subsequent federal habeas corpus litigation, or barred by strict rules governing successive state habeas corpus applications. State habeas corpus counsel's lack of diligence, mistakes, missteps, and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court.

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006), reprinted in Texas Bar Journal Vol. 69, No. 10, Guideline 12.2(B)(1)(e) (emphasis added).

### III.    Several unpresented, potentially meritorious, claims for relief exist that Mr. McCann has failed to raise.

As noted above, Mr. McCann did not gather Mr. Johnson's files during his more than ten-year appointment, so the FPD was forced to spend valuable time and resources completing work that Mr. McCann inexcusably neglected. An initial review of the available materials has brought to light numerous viable claims for relief that Mr. McCann failed to investigate or present to the courts for review. Evidence of Mr. McCann's ineffectiveness in state habeas and his failure to satisfy the duties of CJA counsel in federal habeas will be essential to securing merits review of these claims, as explained in Section IV, *infra*.

Further investigations and development are required before the identified claims can be substantiated with sufficient evidence to prevail, and they are therefore not ripe for judicial review. Additionally, more claims may arise as the FPD continues its work. With that disclaimer, the claims identified for further development are listed below to identify for the Court claims that Mr. McCann failed to litigate.

### A.    Mr. Johnson likely qualifies for a diagnosis of intellectual disability.

At trial, the defense presented evidence from Dr. Dale Watson that it was "a possibility" that Mr. Johnson was intellectually disabled. 31 RR 206. He scored a full scale IQ of 78 on the Stanford-Binet-5 and an IQ of 88 on the WAIS-III. *Id.* at 109, 203. This placed Mr. Johnson at the functional equivalent of a ten-year-old. *Id.* at 201. According to Dr. Watson, based on a variety of factors, Mr. Johnson's actual IQ was somewhere between 74 and 88. Later, at a hearing outside of the jury's presence,

Dr. Watson explained that he did not think Mr. Johnson met the current criteria (from the DSM-IV) for a diagnosis of intellectually disability, and that an adaptive functioning analysis was not conducted. *Id.* at 263.

In *Atkins v. Virginia*, the Supreme Court held that the Eighth Amendment ban on cruel and unusual punishment categorically prohibits the execution of intellectually disabled individuals. 536 U.S. 304, 307 (2002). While the Supreme Court left to the states the task of developing appropriate ways to enforce the categorical exemption, it "did not give the States unfettered discretion." *Hall v. Florida*, 134 S. Ct. 1986, 1998 (2014). Rather, the states' assessment of ID claims must be informed by the opinions of the medical community. *Id.* at 1993, 1998.  The most recent and current opinions of the medical community are found in the Fifth Edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") and the Eleventh Edition of the American Association on Intellectual and Developmental Disabilities' *Intellectual Disability: Definition, Classification, and Systems of Supports* ("AAIDD Manual").  *Moore v. Texas*, 137 S. Ct. 1039, 1048 (2017).  To prove intellectual disability, a defendant must establish (1) deficits in intellectual functioning, (2) deficits in adaptive functioning, and (3) the onset of deficits during the developmental period.  *See Hall*, 134 S. Ct. at 1994; *DSM-5* at 33; *AAIDD Manual* at 5.

Significant legal and medical developments have occurred since Mr. Johnson's trial that raise a substantial likelihood that he is intellectually disabled. In *Hall*, the Supreme Court held that it was impermissible to use a strict cutoff for IQ scores above

70 used to defeat intellectual disability claims. 134 S. Ct. at 714. Moreover, in March 2017, the Supreme Court held in *Moore* that Texas's implementation of *Atkins* was unconstitutional because it created "an unacceptable risk that a person with intellectual disabilities will be executed in violation of the Eighth Amendment," and that State's determination of intellectual disability must take into account the medical communities diagnostic criteria. 137 S. Ct. at 1044. In light of the development in *Moore*, the Texas Court of Criminal Appeals has found numerous individuals to meet the successive petition requirements on intellectual disability claims. *See, e.g.*, *Ex parte Long*, 2018 WL 3217506 (Tex. Crim. App. June 27, 2018) ("In light of the *Moore* decision and the facts presented in applicant's application, we found that applicant's execution should be stayed . . . [and] now find that applicant has satisfied the requirements of Article 11.071, § 5"); *Ex parte Guevara*, 2018 WL 2717041 (Tex. Crim. App. June 6, 2018) ("We find that, in light of *Moore*, applicant has satisfied the requirements of Article 11.071 § 5(a)(1) with regard to his first allegation in the instant subsequent writ application."); *Ex parte Williams*, 2018 WL 2717039 (Tex. Crim. App. June 5, 2018) ("In light of the *Moore* decision and the facts presented in applicant's application, we find that applicant has satisfied the requirements of Article 11.071 § 5.").

The medical community's framework for diagnosing intellectual disability has shifted since Mr. Johnson's trial with the publication of the DSM-5 in 2013. In particular, the DSM-5 places heightened focus on adaptive functioning deficits as opposed to IQ scores. Ex. 1 at 1 (noting that "the severity of impairment [is] based on

adaptive functioning rather than IQ test scores alone."). In fact, the DSM-5 went so far as to remove IQ scores from the diagnostic criteria itself, while noting that it should remain part of the overall assessment. *Id.* at 1-2. The "DSM-5 ensures that [IQ scores] are not overemphasized as the defining factor of a person's overall ability, without adequately considering functioning levels. *Id.* at 1-2. Moreover, "[t]his is especially important in forensic cases." *Id.* at 2.

These legal changes are particularly salient in Mr. Johnson's case, where, despite significant evidence in the trial record of adaptive functioning deficits, the analysis of whether he was intellectually disabled was short-circuited by his IQ scores. 31 RR 263. Testimony was presented from multiple witnesses that Mr. Johnson was (1) slow; (2) different; (3) developmentally delayed; (4) had speech issues; (5) had numerous head injuries as a child; (6) was abused; (7) was not a leader; (8) was in special education classes (9) struggled to read; and (10) had brain damage. 31 RR 34-35; 40-41, 50, 55, 81, 101, 114, 145-46; 32 RR 29, 201, 208. The FPD has consulted with Dr. Watson regarding his testimony, and he has informed them that, while he stands by the accuracy of his trial testimony under clinical norms that existed in 2007, changes in the criteria for intellectual disability warrant full investigation into Mr. Johnson's adaptive functioning, and that his IQ scores would not preclude a diagnosis of intellectual disability.

Mr. McCann has correctly identified this issue in his recent filings as one worth pursuing. However, his delay in pursuing this potential meritorious issue is

unjustified under the circumstances, and may be important evidence supporting merits review of the claim at this late stage.

**B.      Trial counsel were ineffective for failing to preserve error when the State misstated the law during punishment phase closing arguments and claimed that mitigating evidence must be connected to the crime.**

The State pressed several arguments at the penalty phase of Mr. Johnson's trial that directly undermined the jury's ability to give effect to the voluminous mitigation evidence Mr. Johnson had presented, including that he had a low IQ, brain damage, schizophrenia, was barely over 18 at the time of the crime, and suffered numerous traumatic incidents over the course of his life. The State's argument that this evidence was legally irrelevant violated decades of Supreme Court precedent holding that mitigating evidence does not need to have a nexus to the offense. *See Smith v. Texas*, 543 U.S. 37, 45 (2004) (explaining that no prior Supreme Court opinions required a nexus between the mitigating evidence and the crime); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[T]he sentencer in capial cases must be permitted to consider any relevant mitigating factor[.]"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."); *see also Penry v. Johnson*, 532 U.S. 782 (2001); *Penry v. Lynaugh*, 492 U.S. 302 (1989).

The prosecutor told the jury during closing argument that, in regard to the mitigation evidence offered at trial, "[n]one of those things have any connection to this offense. There is nothing that you heard is [*sic*] mitigating because it doesn't reduce this defendant's moral blameworthiness. *It has no connection to the crime that he committed. And that's what our law says mitigation is*." 34 RR 17 (emphasis added). Numerous similar arguments were made by the State erroneously asserting that mitigating evidence required a nexus to the offense. *Id.* at 17 ("Is there anything about the facts in this case that reduce the moral blameworthiness of this defendant for her death in the way she died?"); *id.* at 91 ("What is the correlation between [Mr. Johnson's low IQ] and killing and robbing and raping people? There is none."); *id.* at 99 ("[T]hose [potentially mitigating] factors do not have any bearing on whether you're going to grow up to kill people."); *id.* ("There's no correlation between any of the [potentially mitigating] factors they put forth and criminal violence. There's no connection.")

The prosecutor's argument was at odds with clearly established federal law regarding mitigation evidence.  *See Penry I*, 492 U.S. at 327-28 (jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character, or record, *or* the circumstances of the offense). While trial counsel did object to the first misstatement of the law and was overruled, 34 RR 17, none of the other misleading arguments referenced above by the prosecutor were objected to. As such, the error was waived on direct appeal. Tex. R. App. P. 33.1. Trial counsel's failure to object is a substantial claim of ineffective assistance of counsel.

### C.   A State witness presented false testimony that Mr. Johnson was eligible for a less-restrictive custody classification, and trial counsel were ineffective for eliciting that testimony.

On June 26, 2007, Steven Rogers was called as a witness by the State during the punishment phase of Mr. Johnson's trial. At the time of trial, Mr. Rogers worked for the Texas Department of Criminal Justice ("TDCJ") as a classifications committee member, and he testified regarding classification procedures for individuals convicted of capital murder. 33 RR 102. He explained that TDCJ's classification system includes five levels, G-1 through G-5. *Id.* at 105. G-5 is the most restrictive classification in TDCJ. According to Mr. Rogers, individuals convicted of capital murder and sentenced to life are classified initially as G-3. *Id.* On cross examination, Mr. Rogers explained that, for individuals convicted of capital murder and sentenced to life in prison, there is a "10-year restriction for the G-3 custody to upgrade to G-2, which is to be held in minimum custody[.]" *Id.* at 137.

Mr. Rogers' testimony that Mr. Johnson would be eligible to be classified at the G-2 level after ten years was false. In *Estrada v. State*, the Texas Court of Criminal Appeals reversed the appellant's death sentenced and remanded for a new punishment phase after the State's witness falsely testified that, after ten years, an individual convicted of capital murder and sentenced to life could have his classification downgraded to the less-restrictive G-2 status after ten years. 313 S.W.3d 274 (2010). The court cited a July 2005 TDCJ regulation that stated "[e]ffective 9/01/05, offenders convicted of Capital Murder and sentenced to 'life without parole' will not be classified to a custody less restrictive than G-3 throughout

24

their incarceration." *Id.* at 287. Similarly to *Estrada*, this issue is potentially meritorious as a false testimony claim. And, as the testimony was elicited by trial counsel, an allegation that doing so constituted ineffective assistance is equally meritorious.

### D.  Significant unpresented issues remain regarding Mr. Johnson's conviction.

Considerable testimony at the penalty phase of his trial was presented that Mr. Johnson's functional age was ten years old. 31 RR 201; *see also* 3 CR 622 (*Texas v. Johnson*, No. 1085483, Motion for Instructed Verdict Based on Mental Age (208th D.Ct. Jun. 27, 2007)). He also, unlike some of his co-defendants, had no prior convictions for violent offenses. Yet he was convicted and sentenced to death based on evidence originating almost entirely from co-defendants and informants that he *master-minded* and instructed his co-defendants through a series of robberies and murders. The FPD is investigating the guilt-phase allegations with an eye toward raising IATC, false testimony and other prosecutorial misconduct claims based on new evidence that Mr. Johnson was not the master-mind of the offenses for which he and his co-defendants were convicted. These issues will potentially result in claims under *Strickland v. Washington*, 466 U.S. 688 (1984), *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and other legal avenues.

Mr. McCann has also identified this issue in his recent request for court funding to conduct an end-stage investigation. DE 75. But, the arguments required to have the claims heard on the merits will require presentation of evidence of Mr.

McCann's unreasonable performance in state and federal habeas, making Mr. McCann a witness rather than a disinterested representative.

      **E.**    **Trial counsel were ineffective for failing to investigate and present evidence that Mr. Johnson lacked the requisite intent to commit capital murder.**

As previously noted, Mr. McCann filed a motion seeking to stay the federal proceeding to allow him to present a claim in state court that trial counsel failed to present evidence of Mr. Johnson's "psychological and biological mental impairment" during the merits phase of trial to demonstrate an absence of the requisite intent to commit capital murder. DE 14 at 2-3. The FPD concurs with Mr. McCann's assessment that this claim is potentially meritorious; however, Mr. McCann should have presented this issue in Mr. Johnson's initial state habeas application. And, as explained below in Section IV, *infra*, this claim has potential avenues still available to present it.

      **F.**    **Mr. Johnson's trial counsel worked for the Harris County District Attorney's Office without appropriate protective measures in place.**

Jim Leitner, lead counsel for Mr. Johnson, currently works in a supervisory position with the Harris County District Attorney's Office ("HCDAO")—the same Office that secured Mr. Johnson's conviction and death sentence. After Mr. Johnson's trial, Mr. Leitner joined the HCDAO in 2009, where he served as the First Assistant until 2012. Ex. 2 at 1. Appropriately, on July 22, 2009, the HCDAO voluntarily recused itself from participating in the ongoing legal proceedings, and Brian Wice was appointed as attorney pro tem to act as a special prosecutor in the state habeas

corpus proceedings. *Id.* Subsequently, Mr. Leitner left the HCDAO, and the trial court terminated the appointment of Mr. Wice, finding that "the conflict prompting the appointment of a district attorney pro tem in the applicant's case no longer exists," and allowed the HCDAO back on the case. *Id.* at 3.

The conflict of interest remerged in January of 2017, when Mr. Leitner rejoined the HCDAO. This time, the HCDAO did not voluntarily recuse themselves. Instead, on March 22, 2017, the HCDAO directly contacted Mr. Johnson via letter,[8] informing him that his case may be implicated by errors regarding DNA mixture calculations. Ex. 3. The letter requested that Mr. Johnson himself respond directly to the HCDAO if he would like any DNA mixture evidence in his case recalculated. *Id.* Mr. Johnson, did, in fact, respond and request that his case be assessed.

Despite having directly contacted Mr. Johnson while Mr. Leitner was employed there, the HCDAO took no action regarding the obvious conflict of interest until November 28, 2018, when they screened Mr. Leitner "from all current and future litigation involving Mr. Johnson." Ex. 4 at 2. This screening, which Mr. Johnson does not concede adequately resolved the conflict of interest, did not occur until approximately 23 months after Mr. Leitner rejoined the HCDAO. While this issue does not directly implicate Mr. Johnson's conviction or sentence, it raises serious questions about the propriety of the HCDAO participating in any aspect of Mr. Johnson's case, including the setting of an execution date.

---

[8] The HCDAO's directly contacting Mr. Johnson, while he was represented by counsel, raises serious ethical questions in and of itself.

### G.   New discovery from the State could lead to relief.

On February 19, 2019, the State provided *Brady* notices of two developments that may have a bearing on Mr. Johnson's case. Said notices were not served on the FPD, but were posted to the Harris County district court's docket.

One notice informs that a 2009 audit of the Houston Police Department ("HPD") Latent Print Lab found significant technical errors by three examiners (in 121 cases audited for Ralph Saldivar, 48% had technical errors; in 126 cases audited for Jim Schraub, 64% had technical errors; and in 124 cases audited for Jerry Werner, 52% had technical errors). The auditors stated that "the HPD Latent Print Examiners were unable to meet 'current industry standards'." Ex. 5.

A second notice informs that Senior HPD Officer Todd W. Miller resigned in 2016 in light of his violation of orders related to internal directives, including "Conduct and Authority – Sound Judgment, Truthfulness, and Knowledge of and Obedience to Laws and Rules." HPD issued a "not to be considered for rehire" letter. Ex. 6.

The FPD is investigating the impact of these notices on potential litigation related to prosecutorial misconduct, including why the notices were provided several years after the relevant incidents and on the eve of Mr. Johnson's execution.

## IV.   Viable vehicles exist in both state and federal court to litigate the unpresented claims.

The potentially meritorious claims chronicled above are all currently unexhausted—none were presented to the state court—yet potential avenues for relief still exist in that venue. Moreover, the eventual disposition of these claims in

state court will inform the appropriate method for their presentation in federal court. In light of this, state court is the appropriate forum for the initial litigation of these claims.

### A.    State court vehicles.

Article 11.071, § 5(a) of the Texas Code of Criminal Procedure presents three avenues for the authorization of successive state habeas writs:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

The unpresented claims identified in this motion have one or more potentially viable argument for authorization under this statute.

The claims identified in Section III(A-E), *supra*, should all have been raised in Mr. Johnson's initial state habeas corpus application, but they were not. For each of these issues, it can be asserted that, similar to the *Martinez* standard in federal court, they should be considered now on their merits in state court. Various judges of the Texas Court of Criminal Appeals have indicated that, in a compelling case, they

would authorize applications to proceed under a similar theory. *See Ex parte Alvarez*, 2015 WL 1956254, at *1 (Yeary, Johnson & Newell, JJ., concurring); *Ex parte Buck*, 418 S.W.3d at 109 (Alcala, J., dissenting); *Ex parte McCarthy*, 2013 WL 3283148 at *1 (Meyers, J., concurring); *id.* at *5 (Alcala & Johnson, JJ., dissenting). Moreover, Mr. McCann has an unmistakable conflict of interest regarding these issues, and is unable to raise them himself.

A *Martinez*-type analysis is perfectly consistent with the plain language of Article 11.071 § 5(a)(1), which allows claims to proceed when "the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application[.]" Under general agency principles, an attorney's failures are, in most instances, attributed to the client. However, when and attorney provides ineffective assistance of counsel, that failure is attributed to the State itself. *See Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (explaining the general rule that attorney error "amounting to constitutionally ineffective assistance is 'imputed to the State' and is therefore external to the prisoner," but that attorney error "that does not violate the Constitution . . . is attributed to the prisoner 'under well-settled principles of agency law.'" (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). Taking into consideration the evolution of agency law exceptions in the habeas context, it logically follows that, if an applicant such as Mr. Johnson received ineffective assistance of counsel in state habeas proceedings, then unraised but meritorious claims that were *de facto* unavailable to him because his attorney failed to meet minimum professional

standards were also *de jure* unavailable. *Martinez*, 566 U.S. 1; *Maples v. Thomas*, 566 U.S. 266 (2012).

Moreover, the following authorization arguments exist under state law for the aforementioned claims that are potentially meritorious, in addition to Mr. McCann's ineffectiveness:

(1) Claim III(A), that Mr. Johnson likely qualifies for a diagnosis of intellectual disability can be raised under both § 5(a)(1) and § 5(a)(3);

(2) Claim III(B), that trial counsel were ineffective for failing to preserve error when the State misstated the law during punishment phase closing arguments and claimed that mitigation evidence must be connected to the crime can be raised under § 5(a)(3);

(3) Claim III(C), that a state witness presented false testimony that Mr. Johnson was eligible for a less-restrictive custody classification, and that trial counsel were ineffective for eliciting that information, can be raised under both § 5(a)(1) and § 5(a)(3);

(4) Claim III(D), that significant unpresented issues remain regarding Mr. Johnson's conviction can be raised under both § 5(a)(1) and § 5(a)(2);

(5) Claim III(E), that trial counsel were ineffective for failing to investigate and present evidence that Mr. Johnson lacked the requisite intent to commit capital murder can be raised under § 5(a)(1);

(6) Claim III(G), new discovery from the State, upon the completion of investigation, could be potentially raised under both § 5(a)(1), § 5(a)(2), and § 5(a)(3).

The sheer volume of plausible arguments under which these claims could be authorized to proceed according to state law adds substantial weight to the current motion.

### B.    Federal court vehicles.

As noted above, the proper vehicle for raising these issue will hinge in large part on the state court's disposition of these claims. Those vehicles may include a petition for writ of habeas corpus under 28 U.S.C. § 2254, a successive petition for writ of habeas corpus under 28 U.S.C. § 2244, or a motion for relief from judgment under Federal Rule of Civil Procedure 60(b).

Irrespective of the eventual disposition of these claims by the state courts, a Rule 60(b) motion based Mr. McCann's failure to inform Mr. Johnson of his conflict of interest is potentially meritorious. At the latest, as soon as the Supreme Court decided *Trevino v. Thaler*, 569 U.S. 413, finding Texas petitioners are among those that may seek to litigate defaulted IATC claims under *Martinez*, Mr. McCann had an undeniable conflict of interest that adversely limited the scope of his representation. The conflict was not brought to Mr. Johnson's attention by any officers of the court, and therefore Mr. Johnson was not able to assert his right to conflict-free representation.

The Fifth Circuit has held that a Rule 60(b) motion predicated on the assertion that the petitioner was represented by counsel that had a conflict of interest, and

seeking to proceed in federal habeas with conflict-free counsel, is proper. *See In re Paredes*, 587 Fed. App'x. 805 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 433 (2014). The FPD is investigating the extraordinary circumstances that will justify reopening Mr. Johnson's case under Rule 60(b)(6). Mr. Johnson appears to have several extraordinary circumstances in his case, including the fact that he is the *only* capital federal habeas petitioner in Texas whose conflicted attorney went so far as to identify an IATC claim that he defaulted in state habeas, attempted to raise the claim under the theory that the default was excused by *Martinez*, and then, while still representing the client, affirmatively defended the quality of his own state habeas representation.

## V.     The present representation arrangement, under which two legal teams are tasked with independently pursuing investigations and litigation in anticipation of his May 2, 2019 execution date, risks fatal prejudice to Mr. Johnson.

Traditionally, the state and federal courts have disallowed hybrid representation, under which a defendant or habeas petitioner is represented by counsel while simultaneously representing himself. *See Lee v. Alabama*, 406 F.2d 466, 469 (5th Cir. 1968) (federal habeas petitioners have the right to represent themselves or be represented by counsel, but have no right to a hybrid representation); *Rudd v. State*, 616 S.W.2d 623, 625 (Tex. Crim. App. 1981) (there is no state law right to hybrid representation). Hybrid representation is not forbidden by federal rule or statute, but the risks it poses to defendants' and petitioners' rights are apparent. *See Battaglia v. Stephens*, 2013 WL 5570216 (N.D. Tex. 2013) (terminating hybrid

representation, after referring to it as "an unusual and risky procedure," as evidenced by a missed filing deadline) (unpublished).

The Court's February 5, 2019 order appointing the FPD did not establish a traditional hybrid representation scheme under which one of the representatives is Mr. Johnson himself. However, it did create an equally risky hybrid representation scheme under which two legal teams are proceeding separately and independently with investigations and eventually litigation. The litigation each team decides to pursue may be redundant of the other's efforts, or worse, it may be in direct conflict with the other's efforts. Either result will prejudice Mr. Johnson's rights and interests.

In the wake of *Trevino*, the Fifth Circuit and Texas District Courts have occasionally appointed supplemental counsel to represent capital federal habeas petitioners alongside their originally-appointed CJA counsel when CJA counsel represented their clients in initial state habeas proceedings. When such appointments have been made, the petitioners' cases were remanded to the district court with instructions that their supplemental *Martinez* counsel investigate procedurally defaulted IATC claims and, if substantial claims are identified, litigate them. *Martinez* counsel's role in those cases has been strictly limited to litigating defaulted IATC claims, and originally-appointed CJA counsel have been instructed to continue representing their clients on the claims raised in their initial federal petitions. Thus, this solution creates a type of hybrid representation for some federal habeas petitioners.

34

The appointment of supplemental *Martinez* counsel has proceeded smoothly for petitioners litigating their initial federal habeas petitions, largely because each counsel's role has been clearly defined and counsel have not been proceeding on parallel tracks. However, the hybrid representation in Mr. Johnson's case is lacking the defined roles needed to prevent potential conflicts arising between the two teams' litigation strategies, resulting in the likelihood that his two representatives will file competing claims in the state and federal courts, the evidence and arguments in support of which may be inconsistent and irreconcilable.

Mr. Johnson's initial federal habeas petition has been finally denied and the only remaining litigation to be performed in state or federal court will likely be contingent on meeting heightened pleading requirements—in the form of a Rule 60(b) motion, a second federal habeas petition, or a subsequent application for state habeas relief. Should one of Mr. Johnson's attorneys identify a viable basis for seeking one or more of these forms of relief, and initiate proceedings in accordance with his litigation strategy, his actions will almost certainly prejudice the efforts of his parallel counsel. The result will be a race between Mr. Johnson's representatives with no realistic means of resolving which attorney has conducted the most thorough investigations, and which attorney has identified Mr. Johnson's best claims for relief and legal arguments. This will be particularly harmful to Mr. Johnson in state court, where there are new rules he may rely upon to overcome the abuse of the writ bar, but which may only be used in the *first* habeas proceeding initiated after the creation of the rule. *See*, *e.g.*, *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. Dec. 9,

2009) (establishing due process violation from the State's unknowing use of false or misleading evidence).

If one of Mr. Johnson's current attorneys files the first subsequent habeas application, Mr. Johnson's best claims for relief may go unheard because of arguments that could only be made in the first subsequent application. Moreover, the first filing in any court may present arguments that undermine the arguments and evidence being prepared by Mr. Johnson's other attorney. There is a real risk that the parallel attorneys' efforts will cancel each other out and leave Mr. Johnson with no opportunity to raise unpresented claims before his execution.

The best solution, and the only solution guaranteed to protect Mr. Johnson's rights and interests, is to remove Mr. McCann and allow the FPD to exclusively represent Mr. McCann.

**VI. The FPD is best situated to represent Mr. Johnson in the investigation and pursuit of his unpresented claims.**

**A. Mr. McCann's abysmal performance in representing Mr. Johnson to date should leave this Court with no confidence in his ability to capably represent him going forward.**

Mr. Johnson references the Court to the above factors, which he will not repeat in detail here. As shown above, Mr. McCann does not possess the knowledge and familiarity with the relevant facts, issues, or law that the Court assumed in its order maintaining his appointment. He has failed to conduct simple tasks such as timely collecting the trial team's files, and has taken legal positions *adverse* to Mr. Johnson's best interests. Moreover, he has failed to raise numerous, potential meritorious claims for relief.

36

**B.     Arguments that must be made to render Mr. Johnson's claims procedurally viable cannot be made by Mr. McCann.**

As discussed above, several arguments for initiating state and federal court litigation cannot be made by Mr. McCann because of his conflict of interest under *Martinez*. Counsel cannot reasonably be expected to denigrate their own performance "which threatens their professional reputation and livelihood." *Christeson v. Roper*, 135 S. Ct. 891, 894 (2015). Accordingly, "a significant conflict of interest arises" when the client's strongest arguments are at odds with counsel's interest in protecting his professional reputation. *Id.* (internal quotation marks deleted). *See also McFarland v. Scott*, 512 U.S. 849, 858 (1994) ("the right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's habeas claims").

Mr. McCann has such a conflict of interest. He cannot assert *Martinez* as cause to excuse the procedural default of substantial IATC claims; he cannot argue his own ineffectiveness as an excuse from the state-law bar against successive habeas applications; and he cannot argue that the quality of his own representation violated Mr. Johnson's rights under 18 U.S.C. § 3599. The filing of any claims implicating *Martinez*, and the assertion that Mr. McCann's federal representation violated Mr. Johnson's Section 3599 rights, will also make Mr. McCann a witness against Mr. Johnson in those proceedings. It violates fundamental notions of fairness to maintain the appointment of a hostile witness in the representation of a death-sentenced prisoner on this eve of an execution date.

37

C.    **The FPD is equipped and able to represent Mr. Johnson in both state and federal court.**

The Capital Habeas Unit of the FPD was created to assist inmates such as Mr. Johnson. They are currently fully staffed with twelve employees who have the requisite knowledge, skill, and experience to effectively represent Mr. Johnson in both state and federal court. The FPD is fully qualified to represent Mr. Johnson in both federal and state court litigation. There is no state-law requirement that counsel representing a client in subsequent state habeas proceedings be on the list of qualified 11.071 counsel. *See* Tex. Code Crim. Pro. art 11.071 § 6(b-1). On the contrary, an attorney appointed to represent an indigent state capital prisoner in federal habeas has a statutory obligation to represent the client throughout every subsequent stage of available judicial proceedings, including subsequent state habeas proceedings. 18 U.S.C. § 3599(e); *Wilkins v. Davis*, 832 F.3d 547, 557 (5th Cir. 2016). As the FPD is appointed to represent Mr. Johnson under § 3599(e), the Office has the statutory and legal responsibility to represent Mr. Johnson in ancillary proceedings relating to his conviction and sentence, including in state court. However, out of an abundance of caution and because they are federally-funded, the FPD requests explicit approval from this Court to do so.

VII.   **Conclusion and prayer for relief.**

For the aforementioned reasons, Mr. Johnson respectfully requests that this Court:

(1) Terminate the appointment of Mr. McCann;

(2) Order that the FPD file Mr. Johnson's unpresented claims in state court;

(3) Order that the FPD notify this Court upon the conclusion of the state court

    litigation; and

(4) Stay his execution, as will be explicitly requested in a subsequent motion.


Respectfully submitted,

                                             JASON D. HAWKINS
                                             Federal Public Defender

                                             */s/ Jeremy Schepers*
                                             Jeremy Schepers (24084578)
                                             Supervisor, Capital Habeas Unit
                                             Office of the Federal Public Defender
                                             Northern District of Texas
                                             525 S. Griffin St., Ste. 629
                                             Dallas, Texas 75202
                                             jeremy_schepers@fd.org
                                             (214) 767-2746
                                             (214) 767-2886 (fax)

39

**CERTIFICATE OF CONFERENCE**

I, Jeremy Schepers, hereby certify that on the 5th day of April, 2019, I conferenced this motion with Ellen Stewart-Klein of the Texas Attorney General's Office. She informed me that the Director opposes this motion.

*/s/ Jeremy Schepers*
_____
Jeremy Schepers

**CERTIFICATE OF SERVICE**

I, Jeremy Schepers, hereby certify that on the 5th day of April, 2019, a copy of the foregoing motion was delivered via ECF to the Texas Attorney General's Office, attention Ellen Stewart-Klein.

*/s/ Jeremy Schepers*
_____
Jeremy Schepers